UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

SAZERAC COMPANY, INC., )
)
    Plaintiff, )
)
v. ) CIVIL ACTION NO: __3:23CV-25-GNS__ )
)
REPUBLIC NATIONAL DISTRIBUTING )
COMPANY, LLC, )
)
Serve:   Kentucky Secretary of State )
          700 Capital Ave., Ste. 86 )
          Frankfort, Kentucky 40601 )
)
To Serve: Registered Agent Solutions, Inc. )
          838 Walker Road Suite 21-2 )
          Dover, DE 19904 )
)
    Defendant )
)

## COMPLAINT

Plaintiff Sazerac Company, Inc. ("Sazerac"), by and through its undersigned attorneys for its Complaint against Defendant Republic National Distributing Company, LLC ("RNDC" or "Defendant"), alleges as follows:

### NATURE OF THE ACTION

1. Sazerac has been utilizing the services of RNDC to act as one of its distributors of its brands in states around the country for over a decade. Unfortunately, over the past several years, RNDC's performance as a distributor grew worse and worse. Sazerac has attempted to work with RNDC to come up with ways to improve its performance. None of those efforts have worked. Accordingly, at the end of 2022, Sazerac terminated its relationship with RNDC in approximately 30 states, effective February 1, 2023.

2. Since the termination notice, RNDC has refused to pay for tens of millions of dollars for Sazerac products that it has received and re-sold. As of January 11, 2023, RNDC has stopped payment on approximately $38.6 million of wholesale liquor products. Adding insult to injury, since the termination, RNDC has bad-mouthed Sazerac in the marketplace, ceased cooperation with Sazerac and otherwise attempted to harm Sazerac by unfairly disrupting future sales and the transition to new distributors.

3. Through this action, Sazerac seeks immediate payment for the products received. Sazerac brings claims for RNDC's breach of contract, unjust enrichment, and account stated.

## THE PARTIES

4. Sazerac is a Louisiana corporation with its principal office located at 10101 Linn Station Road, Suite 400, Louisville, Kentucky. Sazerac is a citizen of Louisiana and Kentucky.

5. RNDC is a Delaware limited liability company[1] with its principal office located in the State of Texas. Based on a filing made by RNDC in the Eastern District of Louisiana, Civil Action No. 2:20-01571 (Dkt. 97 in that action), the members of RNDC are (1) NDC Partners, LLC and (2) New BG Distribution Partners, LLC. As that filing indicates, "[t]he complete flow-through analysis of these entities . . . demonstrate[s] the corporate structure and citizenship of the two members of RNDC, and show RNDC is a citizen of the States of Georgia, Arizona, Texas, and California for the purposes of diversity jurisdiction." Specifically, the members of NDC Partners, LLC are National Distributing Company, Inc., a Georgia corporation, and NDC Leasing Company, LLC, which is owned by individual members (who are domiciled in and citizens of Georgia, and Arizona), as well as Carlos Company LLC (whose members include citizens of Georgia) and

---

[1] RNDC does business through its wholly-owned and controlled subsidiaries in several states. However, Sazerac's core relationship was and is with RNDC.

Andrew C. Carlos Family, LLP (whose partners include citizens of Georgia). The members of New BG Distribution Partners, LLC are various individuals (who are domiciled in and citizens of Texas), a number of Trusts (who are citizens of Texas and California), Dreeben Family I, LP (a Texas limited partnership whose general partner is Dreeben Family Management, LLC, whose members are citizens of Texas, and limited partners are citizens of Texas), Block Distributing Company, Ltd. (a Texas limited partnership whose general partner is ELB distributing LLC, whose member is a citizen of Texas, and limited partners are citizens of California and Texas), and BG Spirits, LLC (whose members are citizens of Texas and California), and Phil H. Boeck Family, L.P. (whose partners are citizens of Texas). RNDC is therefore a citizen of Georgia, Arizona, Texas, and California.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because complete diversity exists between Sazerac and RNDC, and because the amount in controversy exceeds $75,000.

7. This Court has personal jurisdiction over RNDC because RNDC maintains offices in and does business in Kentucky and within this District.

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 as RNDC is subject to the Court's personal jurisdiction in this District.

## GENERAL ALLEGATIONS

**A.   The Parties and Their Relationship Prior to September 2021.**

9. Sazerac is family-owned, privately held leading distiller of spirits, with a portfolio of approximately 400 brands spanning a wide variety of spirits, including, among others, Sazerac, Buffalo Trace, Pappy Van Winkle, Blanton's, Eagle Rare, 1792, Canadian Mist, Fireball, Southern Comfort, Platinum Vodka, 99 Brand, and many others.

10. RNDC is an alcohol distributor of wine and spirits in the United States, with operations in at least 37 states.

11. For over a decade, Sazerac worked with RNDC for the distribution of its products. In the United States under the three-tier system applicable to the alcohol beverage industry, beer and liquor companies, also known as suppliers or manufacturers, generally must sell their products to distributors, also known as wholesalers, who then resell the products to retailers. A distributor purchases the product from the supplier at a given price, promotes and sells the product to a retailer (such as a liquor store, bar or restaurant) for a higher price, and then collects some or all of the difference as profit.

**B. RNDC's Refusal to Perform and the Need For Sazerac's Investment In Creating Its Own Field Marketing Teams.**

12. For years during the term of the parties' relationship, Sazerac repeatedly asked RNDC to make reasonable efforts to market and sell Sazerac products. RNDC, however, continued to resist.

13. For example, RNDC refused to invest in its salesforce or to provide sufficient incentive to its employees to promote Sazerac products to retail accounts, thus failing to maximize the sales of Sazerac products.

14. Moreover, RNDC would oftentimes improperly condition the availability of certain high-end (and highly sought after) Sazerac products, such as Pappy Van Winkle, to its retail accounts on the purchase of non-Sazerac products, commonly known as "tie-in" sales.

15. Ultimately, Sazerac notified RNDC that it would be building and training its own marketing force to do most of the marketing work that it had been paying RNDC to do. In connection with this, Sazerac made a significant investment, which will soon exceed $100 million, into creating its own field marketing teams (the Market Development Representative, or "MDR"

program) to achieve what RNDC failed to do in order to effectively market and promote sales of Sazerac products as Sazerac's distributor.

### C. The Parties' September 2021 Global Distribution Agreement.

16. To address the fact that RNDC was performing a reduced role and Sazerac was required to make a larger investment in marketing, on or about September 23, 2021, the parties entered into a global distribution agreement (the "2021 Global Agreement") whereby the parties negotiated and agreed that RNDC would earn a flat per case fee on all cases of Sazerac products, effective September 1, 2021. The parties also agreed to an incentive program whereby RNDC would be paid a per case incentive for certain volume growths and a substantial flat payment for achieving a target total volume growth of Sazerac's Fireball Cinnamon Whiskey product (Sazerac's largest product by volume and revenue).

17. The terms of the 2021 Global Agreement thus provided RNDC a negotiated rate and incentives to promote Sazerac products and increase sales volumes, and at the same time, providing funds to Sazerac for the MDR program necessary to address RNDC's marketing performance. That is, instead of just moving on from RNDC, Sazerac attempted to make things work with RNDC by entering into a new deal that would take into account RNDC's performance failures and the investments necessary for Sazerac's MDR program which subsequently launched in all territories.

### D. RNDC's Refusal to Continue With the Terms of the 2021 Global Agreement and RNDC's Termination of the Parties' Agreement.

18. After several months of operating under the 2021 Global Agreement, RNDC began disputing certain terms of its operation, demanding that the parties meet to discuss adjustments to the rate per case. In fact, in the months leading up to these demands by RNDC, RNDC began communicating that it had no incentive to sell Sazerac products (despite the incentives provided

in the 2021 Global Agreement) and began expressing dissatisfaction with the terms of the global agreement (which RNDC had negotiated just several months before) rather than working to achieve its sales growth incentives.

19. Indeed, after complying with certain reconciliation payment terms under the 2021 Global Agreement in the first two quarters, RNDC breached the agreement by withholding certain reconciliation payment amounts and refusing to pay the same to Sazerac.

20. When Sazerac sent a demand for the withheld amounts, RNDC countered by sending Sazerac a 60-day notice of termination of the parties' agreement and relationship, on or about June 3, 2022, noting "that RNDC is cancelling and otherwise terminating the Agreement, effective sixty (60) days from the date of this letter." In other words, less than a year after the parties had adjusted their entire global relationship, RNDC terminated the relationship effective August 3, 2021, because Sazerac demanded that RNDC comply with its terms.

21. On August 3, 2022, the 2021 Global Agreement terminated pursuant to RNDC's June 3, 2022 termination notice.

22. Both prior to and following August 3, Sazerac repeatedly attempted to work with RNDC to negotiate and come to terms that took into account Sazerac's needs and investments. However, RNDC refused to propose any reasonable terms satisfactory to Sazerac and the parties did not reach a new deal.

23. Nevertheless, following the August 3 termination, Sazerac continued to utilize the services of RNDC as the parties attempted to reach agreement on new terms. But, during this period, RNDC's performance remained poor, just as it was leading up to the 2021 Global Agreement. Yet, RNDC expected to be paid significantly more than during the term of the 2021 Global Agreement despite the fact that Sazerac had invested significant sums to deploy (and now

bore the costs of maintaining) the MDR program to bolster RNDC's inadequate marketing efforts.

### E. Sazerac Terminates the Parties' Relationship and RNDC's Failure to Pay.

24. After years of trying to improve the parties' relationship without success, on December 30, 2022, Sazerac provided RNDC with notice of termination of the parties' relationship in numerous territories, effective February 1, 2023, to allow reasonable notice and transition of the business for both parties.

25. The next business day, however, on January 3, 2023, RNDC began to act contrary to any reasonable transition and, in fact, took efforts to harm Sazerac. For example, Sazerac learned that RNDC was raising prices with certain retailers and withdrawing pricing discounts that were previously planned (which were supported by and paid, in part, by Sazerac), announced as commitments to retailers for the month of January, and therefore relied on by those retailers. While RNDC had the discretion to do so, the sudden unannounced price increase works to damage Sazerac's reputation in the market.

26. In response, Sazerac immediately reiterated to RNDC its commitment to maintaining its current funding of promotional activity for the discounts that had been announced to the market and were expected by retail accounts through the end of the month and requested that RNDC confirm by the end of the day whether it would maintain the price structures expected by the market. RNDC did not confirm by such time. Such actions are expected to result in significant volume losses for the Sazerac portfolio. Likewise, RNDC began cancelling numerous client meetings in multiple locations, without any good faith basis, preventing further discussions of supply chain issues. Importantly, in certain states, RNDC cancelled previously placed purchase orders, refused product deliveries, as well as demanded the immediate pick-up of products by Sazerac, not only causing Sazerac to incur costs and fees in relocating its products but creating out-of-stock issues for retailers, again designed to harm Sazerac's reputation and cause the retailers

to stop buying Sazerac's products in the future.

27. In fact, Sazerac was informed by certain buyers that RNDC representatives informed them that they will not be selling Sazerac products effective immediately, blocking orders. Further, RNDC blocked and/or disabled Sazerac's access to RNDC's order and inventory reporting system, MicroStrategy, which is an essential tool for manufacturers and wholesalers to work together to manage the business, including during the transition period. As a result, Sazerac did not have any visibility into RNDC's inventory of Sazerac products or the ability to track and manage inventory and open orders. Importantly, this occurred even in territories where Sazerac had not provided notice of termination. Access to MicroStrategy was only restored as of January 12, 2023.

28. Relatedly, RNDC made disparaging statements about Sazerac. For instance, despite RNDC's cancellation of purchase orders and refusal of deliveries and the prior shutdown of Sazerac's access to MicroStrategy, RNDC has informed retailers that Sazerac is controlling RNDC's purchase orders and has not shipped goods for several RNDC orders, leading to significant inventory challenges. Additionally, RNDC recently told another producer that RNDC terminated Sazerac because of alleged requests by Sazerac that RNDC take certain improper actions with respect to its bourbon portfolio. These statements are false.

29. Most significantly, in the early hours of January 5, 2023, Sazerac received notice that RNDC had withdrawn its authorization of or otherwise stopped the payments in process for amounts invoiced and due on January 3, 2023 and January 4, 2023, totaling $10,351,968.01.

30. That is, in early December, RNDC had received more than $10 million worth of

spirits for sale later that month. *See* Examples of Invoices, attached as <u>Exhibit 1</u>.[2] Each of these invoices include "Payment Terms" that require payment "30 DAYS FROM INVOICE DATE." When the invoices came due 30 days later, and likely after much (if not all) of the product had been re-sold to retail, RNDC stopped the automatic withdrawal of the amounts due. This was even though the course of dealing between the parties for many years was that Sazerac drew down payment via the EFT process. Not only has RNDC stopped its work as a distributor, it has sold product, made a profit and refused to pay for the underlying goods.

31.     Sazerac immediately raised this issue to RNDC.

32.     In response, RNDC confirmed that it had indeed stopped Sazerac's ability to withdraw the invoiced amounts due from RNDC's account, as the parties had done for years.

33.     RNDC stopped all payments and claimed a unilateral right to "offset" the payments to Sazerac with disputed amounts. But, of course, all of the invoiced amounts are past due and RNDC has never handled any balances between them by refusing payment of past due invoices for product.

34.     On January 6, 2023, Sazerac notified RNDC that the past-due receivables for purchase of products stood at $15,275,380.71 (less a depletion allowance credit of $493,011) as of January 6, 2023. Sazerac made clear that RNDC's ongoing refusal to pay was in complete contradiction of the parties' relationship whereby Sazerac drew amounts due and owed for product previously purchased and delivered on the payment due date. Sazerac demanded immediate payment of the amounts past due.

35.     To date, RNDC has not paid Sazerac in response to Sazerac's demands.

---

[2] These invoices contain confidential and competitively sensitive pricing information, which is likely to cause harm to Sazerac's business if known by competitors. Sazerac will be filing a motion for leave to file the invoices under seal once the case is opened.

36. RNDC's refusal to pay the amounts due for past-due invoices (collectively, the "Invoices" and each an "Invoice") has caused Sazerac damages of approximately $40.7 million, less a depletion credit of approximately $2.1 million through January 12, 2023. Should RNDC continue to refuse to pay its outstanding invoices, Sazerac will suffer additional damages of at least $48 million.

37. Based on its own confirmation that it will not be paying Sazerac until it reaches some global reconciliation in the future after January 31, 2023, RNDC is improperly holding the receivables hostage to demand its reconciliation payment, which Sazerac disputes, without any right to "offset" the same against the invoiced amounts.

## FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

38. Sazerac repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

39. RNDC agreed to abide by the terms of the Invoices under which Sazerac supplied products to RNDC.

40. RNDC ordered products from Sazerac as reflected on the Invoices.

41. With respect to each one of the Invoices, Sazerac fully performed its obligations by selling and supplying all products purchased by RNDC to RNDC. RNDC received, accepted, and retained the products supplied by Sazerac.

42. In connection with the date of the sales and deliveries, Sazerac issued each of the Invoices to RNDC. Each Invoice included "Payment Terms" requiring RNDC to pay Sazerac the amount due under the Invoice "30 DAYS FROM INVOICE DATE."

43. The Invoices that became due between January 3, 2023 and January 12, 2023, total approximately $40.7 million, less a depletion credit of approximately $2.1 million.

44. RNDC refused to pay and failed to pay the amounts due under these Invoices.

45. Without justification or excuse, RNDC has materially breached the payment terms of the Invoices by failing to pay the sums due and owning for the products purchased, within 30 days of the date of each Invoice.

46. As direct and proximate result of RNDC's breaches, Sazerac has suffered damages in the amount of approximately $38.6 million through January 12, 2023, as well as additional costs that Sazerac has to incur to manually reverse the invoices, a time-consuming process. Continued breaches by RNDC will result in at least an additional $48 million in damages.

47. Sazerac is entitled to recover damages from RNDC in an amount to be proven at trial, including interests and costs.

## SECOND CAUSE OF ACTION
## (UNJUST ENRICHMENT)

48. Sazerac repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

49. Sazerac conferred a benefit upon RNDC by providing valuable products to RNDC for which it has not been paid.

50. RNDC accepted the products, and received the benefit of the products. Consequently, RNDC has been unjustly enriched by receiving Sazerac's products without payment.

51. It is inequitable and unconscionable for RNDC to retain the benefit of the products it received without making payment to Sazerac for their value.

52. RNDC is required to disgorge the benefit received from its wrongful conduct.

## THIRD CAUSE OF ACTION
### (ACCOUNT STATED)

53.     Sazerac repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

54.     RNDC agreed to pay Sazerac for the products supplied to RNDC.

55.     With respect to each one of the Invoices, Sazerac sold and supplied all products purchased by RNDC.

56.     Sazerac delivered Invoices to RNDC for payments due within 30 days of each Invoice, totaling approximately $40.7 million through January 12, 2023.  This amount is due subject to a credit of approximately $2.1 million.

57.     RNDC failed to dispute the Invoices and has thus acquiesced to the correctness of the amounts invoiced.

58.     Despite this, RNDC has not properly or timely paid the Invoices; therefore, these Invoices are due and owing.

59.     As a direct and proximate result of these failures by RNDC, Sazerac is entitled to recover damages in an amount to be proven at trial, including interests and costs.

WHEREFORE, Sazerac prays for a judgment as follows:

a)     An award in Sazerac's favor for RNDC's breaches of the payment terms of the Invoices and for amounts owed under the Invoices, to be determined at trial but believed to be approximately a net balance $38.6 million through January 12, 2023 (with additional amounts of $48 million that will become due following the filing of this Complaint) to date;

b)     An award in Sazerac's favor for RNDC's unjust enrichment, providing for disgorgement of the benefit received by RNDC;

c)     An award of Sazerac's pre-judgment and post-judgment interests to the maximum

extent provided by law; and

       d)     Granting Sazerac such other and further relief as the Court deems just and proper.

Dated:    January 13, 2023

                                                   Respectfully submitted,

                                                   /s/ Anne K. Guillory
                                                 Anne K. Guillory
                                                 Philip E. Cecil
                                                 Dinsmore & Shohl LLP
                                                 101 S. Fifth St., Suite 2500
                                                 Louisville, Kentucky 40202
                                                 Telephone: 502.540.2300
                                                 Facsimile: 502.585.2207
                                                 anne.guillory@dinsmore.com
                                                 philip.cecil@dinsmore.com
                                                 *Counsel for Plaintiff, Sazerac Company, Inc.*