IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| SAZERAC COMPANY, INC., | § | |
| | § | |
| *Plaintiff and Counter-Defendant*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:23-CV-25-GNS |
| REPUBLIC NATIONAL DISTRIBUTING | § | |
| COMPANY, LLC, | § | |
| | § | |
| *Defendant and Counter-Plaintiff.* | § | |
| | § | |

**RNDC'S ANSWER TO SAZERAC'S COMPLAINT,
AFFIRMATIVE AND OTHER DEFENSES, AND COUNTERCLAIMS**

Defendant and Counter-Plaintiff Republic National Distributing Company, LLC ("RNDC," "Defendant," or "Counter-Plaintiff") respectfully files its answer and defenses to the Complaint filed by Plaintiff Sazerac Company, Inc. ("Sazerac," "Plaintiff," or "Counter-Defendant") in the above-styled cause (the "Complaint"), and independently brings the counterclaims described below. RNDC denies each and every allegation, matter, and thing set forth in the Complaint, except as otherwise expressly admitted, qualified, or answered below. To the extent statements in headings in the Complaint are considered allegations, they are denied unless expressly admitted.

**ANSWER[1]**

***RNDC's Summary of Case[2]***

This lawsuit represents the culmination of a scheme that Sazerac put into motion long

---

[1] During the relevant timeframe, RNDC distributed products and provided services to Sazerac through its distributor network consisting of affiliated entities in each state where Sazerac products are sold. Though the amounts Sazerac alleges it is owed were invoiced to RNDC's various state-level affiliates, RNDC has been assigned all right, title, and interest in its affiliates' affirmative and other defenses in RNDC's Answer.

[2] Before specifically addressing each numbered paragraph of Sazerac's Complaint, RNDC first presents this introductory summary of the dispute.

before it suddenly terminated RNDC's long-standing distributor rights in 30+ markets—a termination notice that was sent without any prior warning late on the Friday afternoon before the New Year's holiday weekend.

For decades before December 30, 2022, RNDC served as Sazerac's distributor of choice across the country. Over this time, Sazerac's brand, revenues, and certainly its profits grew substantially. Despite this long-standing relationship, beginning over two years ago, Sazerac developed an ill-advised plan to cut costs and regulatory corners by bringing traditional and licensed distributor-only functions in-house, slashing its distributors' profit margins in the process. In doing so, Sazerac made clear how little it values the supplier-distributor relationship at the heart of the beer, wine, and spirits industry.

But Sazerac's plan failed to account for market and regulatory realities and was therefore destined to fail. Though RNDC, a distributor Sazerac referred to as its "partner" in Sazerac's business, tried to make it work, Sazerac's plan compensated RNDC so little for its comprehensive distribution services that the relationship finally became untenable. Rather than simply acquiesce to Sazerac's ill-conceived new model, RNDC began good faith negotiations to protect the time-honored supplier-distributor relationships that have proved so beneficial to the industry since the end of Prohibition, and to find a new, sustainable agreement that would ensure a mutually successful relationship moving forward.

Sazerac, however, wanted to dictate its own terms, regardless of the consequences or RNDC's concerns. To do so, Sazerac used its negotiations with RNDC as a pretext, and rather than negotiate in good faith, it spent the time during what RNDC hoped were good faith negotiations to piece together a patchwork of distributors to replace RNDC across the country.

Since the New Year's Eve termination, Sazerac's scheme—further detailed in RNDC's Counterclaims—has become all too clear: (i) without any prior notice to its long-standing "partner," Sazerac announced to the press and the market the large-scale termination of RNDC in 30+ jurisdictions, resulting in widespread confusion amongst the industry, the parties' customers, and the media—all of which could have been avoided through typical discussions regarding a transition plan; (ii) knowing that it had literally forced RNDC to purchase tens of millions of dollars in Sazerac product *before* the large-scale New Year's Eve termination, Sazerac doubled its own revenues and profits by selling new Sazerac product to its dozens of newly appointed distributors across 30+ markets, leaving RNDC with little to no opportunity to sell its remaining inventory to successor distributors (as is standard industry practice); (iii) Sazerac meanwhile flooded the industry with a false narrative of why Sazerac has chosen its new, impractical distribution model; (iv) Sazerac then trumped-up false allegations of wrongdoing by RNDC as a litigation pretext to convince the market that its ill-conceived new distribution model was a wise choice; *all while* (v) Sazerac did nothing to ensure a smooth transition from RNDC to its dozens of successor distributors, including the inexplicable decision not to call even one of RNDC's executives since the day the termination notice was sent to discuss a productive transition of the business—despite assurances it would do so.

Finally, to deflect attention from its own bad faith, Sazerac filed this lawsuit. Setting aside the inaccuracies littered throughout Sazerac's Complaint, the Complaint is made all the more meritless in that it is *Sazerac* which has entirely stopped paying amounts owed to *RNDC*, not the other way around. Simply put, it is Sazerac, not RNDC, which owes the other millions of dollars. As described below, this suit was allegedly initiated to recover proceeds of sales for inventory that, in actuality, Sazerac obtained through fraud and other wrongful conduct; this conduct should not

be rewarded through payment of these ill-gotten gains. RNDC submits these Counterclaims to seek redress for every dollar owed by Sazerac, and the mounting damages resulting from Sazerac's deceptive, fraudulent, and destructive campaign.

## NATURE OF THE ACTION[3]

1.     RNDC admits that Sazerac has been utilizing the services of RNDC to act as a distributor of its brands in states around the country for over a decade.  RNDC further admits that at the end of 2022, Sazerac sent a notice of termination stating that it was terminating its relationship with RNDC in approximately 30 states, effective February 1, 2023. RNDC denies all remaining allegations in Paragraph 1 of the Complaint.

2.     RNDC denies the allegations in Paragraph 2 of the Complaint.

3.     RNDC denies the allegations in Paragraph 3 of the Complaint.

## PARTIES

4.     RNDC is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 4 of the Complaint and therefore denies them.

5.     RNDC admits that it is a citizen of Georgia, Arizona, Texas, and California, but denies the remaining allegations in Paragraph 5 of the Complaint. RNDC's citizenship is fully set forth in RNDC's Counterclaims.

## JURISDICTION & VENUE

6.     Paragraph 6 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, RNDC admits that this Court has subject matter

---

[3] These headings in RNDC's answer simply duplicate Plaintiff's headings in the Complaint and are in no way intended to suggest that RNDC agrees with the characterizations or alleged facts in those headings.

jurisdiction over the claims asserted in this matter. RNDC denies all remaining allegations in Paragraph 6.

7.      Paragraph 7 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, RNDC admits that this Court has personal jurisdiction over the parties with respect to this matter. RNDC denies all remaining allegations in Paragraph 7.

8.      Paragraph 8 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, RNDC admits that venue is proper in this Court with respect to this matter. RNDC denies all remaining allegations in Paragraph 8.

## "FACTUAL ALLEGATIONS"

**A.      THE PARTIES AND THEIR RELATIONSHIP PRIOR TO SEPTEMBER 2021.**

9.      RNDC is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 9 of the Complaint and therefore denies them.

10.     RNDC admits the allegations in Paragraph 10 of the Complaint.

11.     RNDC denies that in every instance, particularly as it relates to Sazerac as a supplier, a distributor "purchases the product from the supplier at a given price, promotes and sells the product to a retailer (such as a liquor store, bar or restaurant) for a higher price, and then collects some or all of the difference as profit." RNDC admits the remaining allegations in Paragraph 11 of the Complaint.

**B.      RNDC'S REFUSAL TO PERFORM AND THE NEED FOR SAZERAC'S INVESTMENT IN CREATING ITS OWN FIELD MARKETING TEAMS.**

12.     RNDC denies the allegations in Paragraph 12 of the Complaint.

13.     RNDC denies the allegations in Paragraph 13 of the Complaint.

14.     RNDC denies the allegations in Paragraph 14 of the Complaint.

15.    RNDC admits that Sazerac notified RNDC that it would build and train its own marketing/sales force. RNDC denies the remaining allegations in Paragraph 15 of the Complaint.

### C.    THE PARTIES' SEPTEMBER 2021 GLOBAL DISTRIBUTION AGREEMENT.

16.    RNDC admits the existence of a September 2021 global agreement (the "September 2021 Agreement"). RNDC further admits that under the September 2021 Agreement, RNDC was forced to accept a flat per case fee on all cases of Sazerac products and RNDC would be paid a per case incentive for certain volume growths. RNDC denies the remaining allegations in Paragraph 16 of the Complaint.

17.    RNDC admits that RNDC and Sazerac entered into the newly negotiated terms that became part of the overall September 2021 Agreement but denies the remaining allegations in Paragraph 17 of the Complaint.

### D.    RNDC'S REFUSAL TO CONTINUE WITH THE TERMS OF THE 2021 GLOBAL AGREEMENT AND RNDC'S TERMINATION OF THE PARTIES' AGREEMENT.

18.    RNDC admits that it requested that Sazerac meet with RNDC to discuss adjustments to the unworkable rate per case Sazerac had demanded in connection with negotiating the September 2021 Agreement. RNDC denies the remaining allegations in Paragraph 18 of the Complaint.

19.    RNDC denies the allegations in Paragraph 19 of the Complaint.

20.    RNDC denies that it withheld payments and denies the allegation that any of its conduct was done "because Sazerac demanded that RNDC comply with [the September 2021 Agreement's] terms." RNDC admits the remaining allegations in Paragraph 20 of the Complaint.

21.    RNDC admits the allegations in Paragraph 21 of the Complaint.

22.    RNDC admits that RNDC proposed numerous iterations of potential terms to allow the parties to come to a new, workable agreement, and that the parties did not reach a new deal

until after August 3, 2022, when RNDC terminated the September 2021 Agreement and offered to continue the parties' relationship on terms consistent with the parties' pre-September 2021 Agreement terms, which Sazerac accepted. RNDC denies the remaining allegations in Paragraph 22 of the Complaint.

23.    RNDC admits that Sazerac continued to utilize RNDC's services after August 3, 2022, based on certain terms that were part of the parties' prior course of dealing, all of which became effective on or immediately after August 3, 2022. RNDC denies the remaining allegations in Paragraph 23 of the Complaint.

## E.    SAZERAC TERMINATES THE PARTIES' RELATIONSHIP AND RNDC'S FAILURE TO PAY.

24.    RNDC admits that Sazerac provided RNDC with notice of termination of the parties' relationship in 31 markets, effective February 1, 2023. RNDC denies the remaining allegations in Paragraph 24 of the Complaint.

25.    RNDC admits that RNDC has discretion to increase and decrease prices of the products it distributes, and that only the distributor can set pricing, with no legal ability of the supplier to require its products be sold for any particular price. RNDC denies the remaining allegations in Paragraph 25 of the Complaint.

26.    RNDC admits that, since the New Year's Eve termination notice, Sazerac has sent a litany of late night, end of week communications to RNDC containing unfounded accusations and imposing unreasonable and arbitrary deadlines for RNDC to respond. RNDC denies the remaining allegations in Paragraph 26 of the Complaint.

27.    RNDC admits that after a temporary interruption in service as it prepared its internal systems for the wide-spread termination imposed by Sazerac, RNDC restored Sazerac's full access

to MicroStrategy as soon as practicable. RNDC denies the remaining allegations in Paragraph 27 of the Complaint.

28.     RNDC denies the allegations in Paragraph 28 of the Complaint.

29.     RNDC denies the allegations in Paragraph 29 of the Complaint to the extent they characterize RNDC's conduct as "stopp[ing] payments in process for amounts invoiced" by Sazerac.  RNDC denies that the payments described were due on January 3, 2023, and January 24, 2023. Otherwise, RNDC admits that it no longer allowed Sazerac to automatically withdraw funds from RNDC's cash accounts and has paid Sazerac in a manner that is both reasonable and consistent with industry custom and standards.

30.     RNDC admits that after Sazerac's New Year's Eve termination, RNDC restricted Sazerac's ability to automatically withdraw funds from RNDC's financial accounts, a precaution that is consistent with RNDC's and the industry's standard practices when it or another distributor is terminated, and was necessary given the substantial amounts owed by Sazerac to RNDC. By way of further answer, RNDC has committed to and will continue to reconcile the amounts owed to each party to assure all monies owed are "netted out" and each party receives what is owed, all of which is standard and customary in the industry. RNDC denies the remaining allegations in Paragraph 30 of the Complaint.

31.     RNDC denies the allegations in Paragraph 31 of the Complaint.

32.     RNDC denies that amounts were invoiced and due. RNDC admits that it informed Sazerac it had stopped Sazerac's ability to automatically withdraw funds from RNDC's cash accounts. RNDC denies the remaining allegations in Paragraph 32 of the Complaint.

33.     RNDC denies the allegations in Paragraph 33 of the Complaint.

34.     RNDC denies the allegations in Paragraph 34 of the Complaint.

35.     RNDC denies the allegations in Paragraph 35 of the Complaint.

36.     RNDC denies the allegations in Paragraph 36 of the Complaint.

37.     RNDC denies the allegations in Paragraph 37 of the Complaint.

## PLAINTIFF'S FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

38.     In responding to Paragraph 38 of the Complaint, RNDC repeats and incorporates by reference each response to each paragraph above as though fully set forth herein.

39.     RNDC denies the allegations in Paragraph 39 of the Complaint.

40.     RNDC denies the allegations in Paragraph 40 of the Complaint.

41.     RNDC denies the allegations in Paragraph 41 of the Complaint.

42.     RNDC denies the allegations in Paragraph 42 of the Complaint.

43.     RNDC denies the allegations in Paragraph 43 of the Complaint.

44.     RNDC denies the allegations in Paragraph 44 of the Complaint.

45.     RNDC denies the allegations in Paragraph 45 of the Complaint.

46.     RNDC denies the allegations in Paragraph 46 of the Complaint.

47.     RNDC denies the allegations in Paragraph 47 of the Complaint.

## PLAINTIFF'S SECOND CAUSE OF ACTION
### (UNJUST ENRICHMENT)

48.     In responding to Paragraph 48 of the Complaint, RNDC repeats and incorporates by reference each response to each paragraph above as though fully set forth herein.

49.     RNDC denies the allegations in Paragraph 49 of the Complaint.

50.     RNDC denies the allegations in Paragraph 50 of the Complaint.

51.     RNDC denies the allegations in Paragraph 51 of the Complaint.

52.     RNDC denies the allegations in Paragraph 52 of the Complaint.

## PLAINTIFF'S THIRD CAUSE OF ACTION
### (ACCOUNT STATED)

53.     In responding to Paragraph 53 of the Complaint, RNDC repeats and incorporates by reference each response to each paragraph above as though fully set forth herein.

54.     RNDC denies the allegations in Paragraph 54 of the Complaint.

55.     RNDC denies the allegations in Paragraph 55 of the Complaint.

56.     RNDC denies the allegations in Paragraph 56 of the Complaint.

57.     RNDC denies the allegations in Paragraph 57 of the Complaint.

58.     RNDC denies the allegations in Paragraph 58 of the Complaint.

59.     RNDC denies the allegations in Paragraph 59 of the Complaint.

Unnumbered Prayer for Relief: RNDC denies that Sazerac is entitled to any of the relief it seeks.

## II.
## RNDC'S AFFIRMATIVE AND OTHER DEFENSES

RNDC asserts the following affirmative and additional defenses, without assuming the burden of proof for any issues to which the applicable law places the burden on Sazerac. Moreover, nothing stated herein is intended to be construed as an acknowledgement that any particular issue or subject matter is relevant to Sazerac's allegations. Furthermore, all defenses are pleaded in the alternative, and none constitutes an admission of liability or that Sazerac is entitled to any relief on its claims or causes of action. In addition, RNDC specifically reserves all rights to amend its answer to allege additional defenses that become known through the course of discovery or otherwise.

60.     Sazerac's claims are barred, in whole or in part, because the Complaint fails to state a claim upon which relief can be granted.

61.    Sazerac's claims are barred, in whole or in part, by the doctrine of prior material breach. The facts supporting this defense are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein.

62.    Sazerac's claims are barred, in whole or in part, by the doctrine of unclean hands. The facts supporting this defense are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein.

63.    Sazerac's claims are barred, in whole or in part, by the doctrine of waiver. The facts supporting this defense are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein.

64.    Sazerac's claims are barred, in whole or in part, by the doctrines of estoppel and quasi-estoppel. The facts supporting these defensive doctrines are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein.

65.    Sazerac's claims are barred, in whole or in part, by the doctrine of laches. The facts supporting this defense are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein.

66.    Sazerac's claims fail, in whole or in part, because RNDC always acted in good faith relevant to the allegations set forth in the Complaint and Sazerac has acted in bad faith, both prior to and after the New Year's Eve termination notice that is the subject of this suit. The facts supporting this defense are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein.

67.    Sazerac's request for relief should be denied because Sazerac is liable to RNDC for breach of contract, unjust enrichment, promissory estoppel, equitable estoppel, fraudulent

inducement, fraudulent concealment/nondisclosure, negligent misrepresentation, tortious interference with business expectancy and/or business relationships, and negligence per se (all of which are detailed below in RNDC's Counterclaims and specifically incorporated herein by reference as though fully set forth herein).

68.    Sazerac's claims fail, in whole or in part, because it ratified the Distribution Agreement (as defined in RNDC's Counterclaims, i.e., the agreement between RNDC and Sazerac in place prior to and following the September 2021 Agreement) between the parties after the August 3, 2022 termination notice sent by RNDC. Additionally, because a valid contract existed between the parties, Sazerac's claim for unjust enrichment fails.

69.    Sazerac's claims fail, in whole or in part, because Sazerac failed to mitigate its damages by, among other things, refusing to accept returns of the unsold inventory at issue. The facts supporting this defense are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein

70.    Sazerac's request for relief should be denied, in whole or in part, because RNDC is entitled to setoff for the amounts Sazerac owes to RNDC. The facts supporting RNDC's entitlement to setoff are alleged and described in RNDC's Counterclaims, which are specifically incorporated herein by reference as though fully set forth herein

71.    RNDC specifically denies that Sazerac has satisfied all conditions precedent to its claims for relief.

## III.
## RNDC'S COUNTERCLAIMS[4]

Counter-Plaintiff Republic National Distributing Company, LLC ("RNDC") brings the following Counterclaims against Counter-Defendant Sazerac Company, Inc. ("Sazerac").

### THE PARTIES

72.     RNDC is a Delaware limited liability company with its principal place of business in the State of Texas. As a limited liability company, RNDC's citizenship is determined by that of its members. RNDC is a citizen of Georgia, Arizona, Texas, and California because RNDC's members consist of two other limited liability companies—NDC Partners, LLC and New BG Distribution Partners, LLC—whose memberships are comprised of citizens of Georgia, Arizona, Texas, and California:

a) **NDC Partners, LLC:** The members of NDC Partners, LLC are National Distributing Company, Inc. and NDC Leasing Company, LLC.

   i.   **National Distributing Company, Inc.** is a Georgia corporation having its principal place of business in the State of Georgia.

   ii.  **NDC Leasing Company, LLC's** membership includes individual members, a limited liability company, and a limited liability partnership. The following individual members are citizens of and domiciled in the State of Georgia: Helen A. Carlos, James A. Carlos, John A. Carlos, Kenneth Rosenberg, Alan Rosenberg, Elizabeth Davis, Richard J. Davis, Jay M. Davis, and Dulcy D. Rosenberg. The remaining individual member, Karen Rosenberg Musa, is a

---

[4] During the relevant timeframe, RNDC distributed products and provided services to Sazerac through its distributor network of affiliated entities. RNDC has been assigned all right, title and interest in its affiliates' claims, causes of action, and damages asserted in RNDC's Counterclaims.

citizen of and domiciled in the State of Arizona. The remaining members of NDC Leasing Company, LLC are Carlos Company, LLC and Andrew C. Carlos Family, LLP. Carlos Company, LLC's members are: the Trust of John A. Carlos and the Trust of Helen A. Carlos, with John A. Carlos and Helen A. Carlos—both citizens of and domiciled in the State of Georgia—as named Trustees and Beneficiaries of their respective trusts; and Chris M. Carlos, citizen of and domiciled in the State of Georgia. Andrew C. Carlos Family, LLP's partners are: individuals John Carlos, Jimmy Carlos, and Helen Carlos, each of whom is a citizen of and domiciled in the State of Georgia; and the following trusts: Helen Carlos 1997 Trust, Trustee and Beneficiary Helen Carlos, citizen of and domiciled in the State of Georgia; John Carlos 1997 Trust, Trustee and Beneficiary John A. Carlos, citizen of and domiciled in the State of Georgia; James Carlos 1997 Trust, Trustee and Beneficiary James A. Carlos, citizen of and domiciled in the State of Georgia; and U/A Trust FBO Helen A. Carlos, Trustee and Beneficiary Helen A. Carlos, citizen of and domiciled in the State of Georgia.

b) **New BG Distribution Partners, LLC:** New BG Distribution Partners, LLC's membership includes individual members, several trusts, an estate, a limited liability company, and a limited partnership.

   i.   New BG Distribution Partners, LLC's individual members are the following individuals, who are citizens of and domiciled in the State of Texas: Edward L. Block, Allison D. Zeller, Josh Zeller, Lisa D. Sechler, Grant Kelly Sechler, Paige D. Sachs, Marc Sachs, and Phil Boeck.

ii.    The estate member of New BG Distribution Partners, LLC is the Estate of Margery Block, Executor Edward L. Block, citizen of and domiciled in the State of Texas.

iii.    The trust members of New BG Distribution Partners, LLC are the following: (1) Stephanie Block Property Trust A, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (2) Stephanie Block Property Trust B, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (3) MB-Stephanie L. Block DGT Trust, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (4) Corey Block Property Trust A, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (5) Corey Block Property Trust B, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (6) MB-Corey A. Block DGT Trust, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (7) Allison Zeller Property Trust II, Trustee and Beneficiary, Allison Zeller, citizen of and domiciled in the State of Texas, (8) MB-Allison Dreeben Zeller DGT Trust, Trustee and Beneficiary, Allison Zeller, citizen of and domiciled in the State of Texas, (9) Lisa Sechler Property Trust II, Trustee and Beneficiary, Lisa Sechler, citizen of and domiciled in the State of Texas, (10) MB-Lisa Dreeben Sechler DGT Trust, Trustee and Beneficiary, Lisa Sechler, citizen of and domiciled in the State of Texas, (11) Paige Sachs Property Trust II, Trustee and Beneficiary, Paige Sachs, citizen of and domiciled in the State of Texas, and (12) MB-Paige Dreeben Sachs DGT Trust,

Trustee and Beneficiary, Paige Sachs, citizen of and domiciled in the State of Texas.

iv.    Member **BG Spirits, LLC** is a Texas limited liability company. Its individual members are the following individuals, who are citizens of and domiciled in the State of Texas: Edward L. Block, Allison Zeller, Josh Zeller, Lisa Sechler, Grant Kelly Sechler, Paige Sachs and Marc Sachs. Members also consist of the Estate of Margery Block, Executor Edward L. Block, citizen of and domiciled in the State of Texas, and the following trusts: (1) Stephanie L. Block Property Trust-A, Trustee and Beneficiary, Stephanie L. Block, citizen of and domiciled in the State of California; (2) Stephanie L. Block Property Trust-B, Trustee and Beneficiary, Stephanie L. Block, citizen of and domiciled in the State of California; (3) Corey A. Block Property Trust-A, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California; and (4) Corey A. Block Property Trust-B, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California.

v.    Member **Block Distributing Company, Ltd.** ("**BDC**") is a Texas limited partnership. The general partner of BDC is ELB Distributing, LLC, a Texas limited liability company. The sole member of ELB Distributing, LLC is Edward L. Block, citizen of and domiciled in the State of Texas. The following individuals are limited partners of BDC: Stephanie Block and Corey Block, both citizens of and domiciled in the State of California, and Edward L. Block, Phil H. Boeck, Lisa Sechler, Allison Zeller, and Paige Sachs, all citizens of and domiciled in the State of Texas. Limited partners also include the Estate

of Margery Block, Executor Edward L. Block, citizen of and domiciled in the State of Texas. The following trusts are also limited partners of BDC: (1) Stephanie Block QSST, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (2) Stephanie Block ESBT, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (3) Stephanie Block Property Trust A, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (4) Stephanie Block Property Trust B, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (5) MB-Stephanie Block DGT Trust, Trustee and Beneficiary, Stephanie Block, citizen of and domiciled in the State of California, (6) Corey Block QSST, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (7) Corey Block ESBT, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (8) Corey Block Property Trust A, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (9) Corey Block Property Trust B, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (10) MB-Corey Block DGT Trust, Trustee and Beneficiary, Corey Block, citizen of and domiciled in the State of California, (11) Lisa Sechler QSST, Trustee and Beneficiary, Lisa Sechler, citizen of and domiciled in the State of Texas, (12) Lisa Sechler ESBT, Trustee and Beneficiary, Lisa Sechler, citizen of and domiciled in the State of Texas, (13) Lisa Sechler Property Trust, Trustee and Beneficiary, Lisa Sechler, citizen of and domiciled in the State of Texas, (14)

Lisa Sechler Property Trust III, Trustee and Beneficiary, Lisa Sechler, citizen of and domiciled in the State of Texas, (15) MB-Lisa Sechler DGT Trust, Trustee and Beneficiary, Lisa Sechler, citizen of and domiciled in the State of Texas, (16) Allison Zeller QSST, Trustee and Beneficiary, Allison Zeller, citizen of and domiciled in the State of Texas, (17) Allison Zeller ESBT, Trustee and Beneficiary, Allison Zeller, citizen of and domiciled in the State of Texas, (18) Allison Zeller Property Trust, Trustee and Beneficiary, Allison Zeller, citizen of and domiciled in the State of Texas, (19) Allison Zeller Property Trust III, Trustee and Beneficiary, Allison Zeller, citizen of and domiciled in the State of Texas, (20) MB-Allison Zeller DGT Trust, Trustee and Beneficiary, Allison Zeller, citizen of and domiciled in the State of Texas, (21) Paige Sachs QSST, Trustee and Beneficiary, Paige Sachs, citizen of and domiciled in the State of Texas, (22) Paige Sachs ESBT, Trustee and Beneficiary, Paige Sachs, citizen of and domiciled in the State of Texas, (23) Paige Sachs Property Trust, Trustee and Beneficiary, Paige Sachs, citizen of and domiciled in the State of Texas, (24) Paige Sachs Property Trust III, Trustee and Beneficiary, Paige Sachs, citizen of and domiciled in the State of Texas, and (25) MB-Paige Sachs DGT Trust, Trustee and Beneficiary, Paige Sachs, citizen of and domiciled in the State of Texas.

73.     Sazerac is a Louisiana corporation with its principal place of business in the State of Kentucky. Sazerac is a citizen of Louisiana and Kentucky.

## JURISDICTION AND VENUE

74.    This Court has diversity jurisdiction over this lawsuit under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of costs and interests, and is between citizens of different states.

75.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (b)(3) because a substantial part of the events giving rise to the claims asserted in this case occurred within this judicial district and all the Parties are subject to personal jurisdiction in this judicial district.

## FACTS

### *Introduction*

76.    As described generally above, this case stems from the deterioration of a long-standing alcohol beverage supplier-distributor relationship. The relationship between RNDC and Sazerac thrived for decades but has been torn apart by Sazerac's two-plus year effort to strip RNDC of its distributor role and circumvent the three-tier system that has helped make this industry so successful. To better illustrate the extent of Sazerac's wrongful, bad faith conduct, RNDC first provides a general description of the wine and spirits business.

### *The Alcohol Beverage Industry*

77.    Though each state maintains its own unique alcohol beverage laws, the alcohol beverage industry across the country is organized according to the "three-tier system." The three-tier system is comprised of suppliers, distributors, and retailers[5] and is a legal and regulatory construct designed to restrict and limit the vertical integration of the three tiers, including the

---

[5] Just as the laws themselves differ from state to state, so too does how a company such as RNDC operates. For instance, in "control" states where the state itself has a monopoly on wine and/or spirits distribution, RNDC operates as a "broker" on behalf of suppliers. For simplicity, and as primarily relevant to this matter, RNDC will use the terms supplier, distributor, and retailer herein.

ability of a supplier to engage in activities and perform functions limited to the distributor tier. Suppliers manufacture or import alcohol beverage products and sell them to distributors; distributors distribute alcohol beverage products to retailers; and retailers sell alcohol beverage products to consumers. In certain states (called "control states"), the state itself generally serves both the distribution and retail functions of the three-tier system.

78.     Generally speaking, participants in the three-tier system must be licensed by the state in which they do business. These licenses specify the types of conduct a licensed party may engage in, and the privileges applicable to each type of license are embedded in the license required to operate in a given tier. And, for the most part, state laws preclude industry participants from directly participating in, or controlling, more than one tier. In other words, with certain limited exceptions, one company cannot both produce or import an alcohol beverage product **and** sell it to retailers and/or consumers.

79.     Suppliers often enter into distribution agreements with their distributor of choice. These agreements outline the duties and obligations of the parties including local and national marketing efforts to be carried out by distributors' sales teams, distributors' sales and new placements goals, territories and products covered, and other material terms related to increasing sales of suppliers' products and building brand awareness. Distributors' duties also include ordering alcohol beverage products from suppliers according to agreed-upon terms, paying state excise taxes, and (to the extent permitted by state law) handling all aspects of distributing that inventory to liquor stores, groceries, restaurants, bars, and other retail establishments on a daily basis.[6] In addition to the physical act of storing, processing, and moving inventory from one place

---

[6] Retailers generally fall into one of two categories: "on-premise" retailers—i.e., locations where alcohol beverages are sold to consumers for on-premises consumption, like bars and restaurants; and "off-premise" retailers—i.e., locations where alcohol beverages are sold to consumers to be consumed elsewhere, like liquor stores and groceries. For simplicity, both on-premise and off-premise entities are referred to herein as "retailers."

to another, distributors serve many crucial brand-promotion and customer-relations functions for themselves and on behalf of their supplier "partners." Distributors are by and large the only members of the three-tier system allowed to quote prices to and solicit and take orders from retailers. Indeed, in many states, distributors' sales personnel must be separately licensed and meet strict licensing requirements. Notably, several states authorize statutory termination fees for distributors when a supplier-distributor relationship ends. These statutory termination fees recognize and are aimed at compensating distributors' significant investment of time, resources, personnel, and funds towards building a supplier's brand.

### *RNDC and Sazerac's Relationship*

80.     RNDC is one of the nation's largest distributors of wine and spirits. RNDC's roots trace back multiple generations to three family-owned wholesale alcohol beverage distribution businesses with a long, established history in the alcohol beverage industry. Today, RNDC operates in 38 states and the District of Columbia, providing brand-building, promotional and marketing services and acting as a product expert liaison between suppliers and retailers of alcohol beverages. In short, RNDC is a brand builder—"Experts at our Craft."

81.     Sazerac is a supplier and maintains a portfolio of hundreds of different spirits brands.

82.     For decades, RNDC served as Sazerac's distributor in over 30 states throughout the U.S., and to this day continues to serve as Sazerac's exclusive distributor in Georgia and New Mexico. Unlike RNDC's other supplier partners, Sazerac has historically refused to enter a formal, written distribution contract with RNDC. Accordingly, between approximately 2011 and September 2021, the parties' relationship was governed by email agreements and a mutually accepted course of dealing that was amended from time to time (the "Distribution Agreement").

RNDC purchased inventory from Sazerac to be distributed across the U.S. and delivered Sazerac's alcohol beverage products to their shared customers such as grocery chains, convenience stores, bars, and restaurants across the country.

83.    As Sazerac's distributor, RNDC also performed marketing, promotional, and merchandising activities. These activities (where permitted by state laws) included, for example, hosting promotional events like tastings to educate retailers or consumers about the Sazerac brand, developing cocktail recipes, building in-store product displays to call special attention to Sazerac's brands, keeping shelves organized, clean, and stocked with Sazerac products, recommending shelf plans and drink lists, and visiting retailers in the market to promote existing and new Sazerac products. RNDC also served in the critical customer relations role, strengthening existing relationships with retailers and working to grow Sazerac's business by securing new accounts, increasing Sazerac's product portfolio in existing retailers, and pitching retailers to generally buy more Sazerac products than they were currently purchasing. If any issues with a product arose, RNDC was also there in the local markets to work with the retailers on a solution.

84.    Under the Distribution Agreement, RNDC's compensation for its distribution services amounted to the margins it recouped on sales to retailers after purchasing product at wholesale prices from Sazerac. RNDC supports its services with these margins. This pre-September 2021 workable model did not suffer from unreasonable constraints and allowed for each party to thrive and meet an ever-increasing cost of doing business (fuel, wages, lease, etc.). As part of its role as distributor, RNDC also designated a certain portion of its own profits from the sale of Sazerac products each month as "marketing funds" in various local markets where RNDC distributed Sazerac products. These "marketing funds" were dedicated funds intended to be used on promotional activities for Sazerac products.

85.     Due to the vast geographic footprint of their partnership, Sazerac represented a significant supplier in RNDC's overall portfolio of brands. Because of the importance of its relationship with Sazerac, it only made sense for RNDC to work as hard as possible to keep Sazerac happy. And RNDC did just that.

86.     Unfortunately for RNDC, over time Sazerac acted more like an adversary than a long-time partner. Sazerac consistently set unattainable standards for RNDC that seemed designed to set up RNDC for failure—while ignoring RNDC's successes and the data-supported evidence of RNDC's positive impact on Sazerac's business. In essence, Sazerac would blame RNDC for Sazerac's own failures, mishaps, and bad business decisions.

87.     Additionally, over the last five years, it was not uncommon for RNDC to learn that Sazerac was slandering RNDC in self-serving—and inaccurate—statements to their shared retail customers. In one recurring pattern, Sazerac would demand that RNDC allocate its product in a certain way amongst retailers, and then behind RNDC's back, blame RNDC when the retailer expressed dissatisfaction with its allocations. This conduct was not only harmful to RNDC's reputation and relationships with customers, but it also encroached on RNDC's role in the three-tier structure and raised concerns of potential violations of state regulations requiring distributors alone (within the privileges of their state license) to determine product allocations in a fair and equitable manner.  RNDC was forced to raise these concerns to Sazerac on a number of occasions, but unfortunately the conduct persisted.

88.     Notwithstanding the challenges presented by working with Sazerac, RNDC continued to devote significant effort, personnel, time, and resources in growing the parties' shared business. RNDC did so in full reliance upon the understanding that short-term hardships were worth the long-term reward of a partnership with Sazerac in 30+ states. By the Fall of 2021,

however, the parties' relationship could hardly be described as a partnership. RNDC continued to perform at a high level delivering positive marketing and financial results for Sazerac—working hard to achieve joint successes for both Sazerac and RNDC—but Sazerac only looked out for Sazerac. According to Sazerac's own executives, RNDC's role as distributor amounted to no more than "four wheels and a truck."

**_Sazerac's Shift in Strategy_**

89.     In 2021, in keeping with its pattern of devaluing the distributorship tier, Sazerac announced a desire to fundamentally alter its own business model and the entire structure of its relationship with RNDC. Focused only on its own short-sighted bottom-line, Sazerac mandated a new pricing structure that would severely reduce, and in some cases, eliminate RNDC's gross profit using a set "per case" rate. Sazerac justified the reduced rate by insisting that it would be taking much of the marketing, sales, product placement, promotional, and merchandising activities "in-house" so that all of its distributors, including RNDC, could focus solely on order fulfilment, logistics, and delivery. Thus, purportedly to relieve the strain on RNDC that would ensue from such low margins, Sazerac promised to create and employ its own team of "Market Development Representatives" and "Market Development Managers" (the "MDR/MDM Program," as Sazerac termed it).

90.     The new arrangement proposed by Sazerac was reflected in a series of emails between Sazerac and RNDC executives in or about September of 2021 (the "September 2021 Agreement"). The September 2021 Agreement provided that RNDC would keep $8.50 per case as its gross profit, regardless of product category or type, for distributing Sazerac products, with the balance of the gross profit that would be otherwise generated designated to Sazerac promotional activities. Importantly, the September 2021 Agreement also acknowledged that the $8.50 per case

base rate would index annually for inflation. In exchange for reducing RNDC's gross profit, Sazerac promised to make commercially reasonable efforts to implement and fully staff its MDR/MDM Program at all times. Sazerac's representations regarding its MDR/MDM Program were important because it would be impossible for RNDC's and Sazerac's shared customers to continue to experience the level of service to which they were accustomed from RNDC without designated personnel managing those relationships—and it would likewise be impossible for RNDC to provide that same level of service at the substantially reduced margins Sazerac required.

91.     RNDC had concerns that Sazerac's new model would violate applicable regulations prohibiting vertical integration of suppliers and distributors, but RNDC took steps to ensure that its own conduct would continue to comply with applicable laws. As a decades-long and dedicated "partner," RNDC agreed to move forward with Sazerac's desired new structure so long as Sazerac complied with the regulatory framework and fulfilled its promises to build out its MDR/MDM Program.

92.     Before long, however, the situation became untenable and revealed itself as violative of the three-tier regulatory framework. For starters, Sazerac's plan drastically undervalued the role that RNDC plays as a distributor.  RNDC continued to invest substantial time and money in performing many of the sales, marketing, customer-relations, and merchandising functions it previously had provided. This was in large part because, well into 2022, Sazerac fell far short of its own staffing projections for the MDM/MDR Program. Sazerac's proposed new program also failed to account on a state-by-state basis for the fact that the three-tier system and state laws in numerous jurisdictions specifically preclude suppliers from performing certain marketing, promotional, and sales activities that a distributor typically performs—and alone is allowed to perform under the three-tier system. As a result, though Sazerac had promised that

RNDC would do less work for less money, in many instances, RNDC was doing the same work while earning far less money, all while the few MDM/MDR personnel Sazerac had hired were potentially violating various states' laws.

93.     Further complicating matters, Sazerac had insisted on implementing a new vendor-managed inventory ("VMI") system state-by-state. In sum, Sazerac took control over ordering its own product and inventory for RNDC.  This meant that Sazerac would decide how much of its inventory it required RNDC to purchase—regardless of demand—order it, ship it to RNDC, and then invoice RNDC for every item, thereafter "sweeping" RNDC's cash accounts as payment for the product Sazerac had unilaterally ordered on RNDC's behalf. This new system was problematic in several respects, including because it represented another attempt by Sazerac to evade the three-tier structure designed to maintain separation of the tiers.

94.     Sazerac was soon consistently ordering inventory on RNDC's behalf in volumes far exceeding RNDC's forecasted demand. RNDC raised the recurring VMI issues with Sazerac, but Sazerac promised and convinced RNDC that Sazerac would order the appropriate amount of inventory given the expected demand in the marketplace. Specifically, RNDC personnel held regular telephone calls with their Sazerac counterparts Mitch Federman, Nick Colbert, and Ryan Boyd to discuss VMI and Sazerac's practice of ordering excessive inventory on RNDC's behalf. Federman, Colbert, and Boyd repeatedly committed to a "days-on-hand" target of 40 to 45 days—meaning that Sazerac would employ commercially reasonable efforts to supply no more inventory on a given date than RNDC could sell in 40-45 days from that date. This commitment was made repeatedly by Federman, Colbert, and Boyd, including on March 24, 2022, April 7, 2022, and April 29, 2022 calls with RNDC representatives, as well as by Boyd on a separate March 23, 2022 call with RNDC representatives. But Sazerac's excessive inventory practices continued.

95.    Then, in early 2022, inflation struck the global economy and further strained RNDC under the $8.50 per case model. The costs of freight, fuel, and storage soared. Now, RNDC was struggling to break-even on shipping and delivery of Sazerac product—on top of the additional marketing and promotional work it was still left to perform without commensurate payment. RNDC soon began experiencing negative margins on Sazerac products in many of its markets.

96.    On numerous occasions, RNDC presented its concerns to Sazerac. In response to RNDC's concerns about inflation and increases in costs, a Sazerac executive claimed that Sazerac's costs of doing business—e.g., fuel costs, labor costs, and the like—had not changed at all and that RNDC's concerns were unfounded. Despite Sazerac's flippant response, RNDC nevertheless repeatedly requested to meet with Sazerac so the parties could engage in a productive dialogue to find a fair solution that would benefit all parties. But Sazerac brushed off these concerns and refused to engage in a discussion about revisiting the $8.50 per case rate—ignoring its own commitment in the September 2021 Agreement to index the base rate annually for inflation.

**_RNDC Takes Action to Protect its Business_**

97.    RNDC was thereafter left with no other choice but to stand up for its constituents—including its employees, customers, and investors—and the mutual retailer clients of Sazerac and RNDC. If it continued to operate as Sazerac's distributor while being paid for only a fraction of the services it performed at well below its operating costs, RNDC knew it could not continue distributing Sazerac brands.

98.    In June 2022, after repeatedly trying to encourage Sazerac to negotiate a new rate, RNDC served Sazerac with a notice terminating the September 2021 Agreement, effective August 3, 2022. RNDC made clear, both in the termination notice and in conversations with Sazerac personnel, that it had every desire to continue serving as Sazerac's distributor but could not

continue under the one-sided terms thrust upon RNDC by the September 2021 Agreement. After the notice of termination was sent in June, RNDC invited Sazerac to negotiate a new, fair agreement based on data-driven metrics that would allow RNDC to reap a modest profit and the parties to continue their nation-wide relationship. Unfortunately, August 3 came and went with Sazerac continuing to make unreasonable demands, and the September 2021 Agreement terminated on that date.

99.     Considering the enormity of the parties' shared business, and the lack of any transition plan in place, RNDC and Sazerac continued to do business with each other after August 3 based upon the pre-September 2021 Distribution Agreement. However, as "punishment" for the August 3 termination of the September 2021 Agreement, Sazerac chose to terminate RNDC's distribution rights in Colorado, Washington, and Michigan. Sazerac made clear, though, that it would continue to accept RNDC's proposals for new terms to govern the parties' relationship going forward in the remaining 30+ markets where they continued to do business.

100.     From August 4, 2022, up until Sazerac's New Year's Eve termination, and consistent with the Distribution Agreement, RNDC offered its full suite of distribution and brokerage services to Sazerac on a 30+ market basis, in exchange for earning full margins on products purchased and sold. RNDC continued to accept large quantities of Sazerac product based upon the mutual understanding at the center of the supplier-distributor relationship: RNDC would pay for Sazerac product at wholesale prices, and RNDC would then sell that product to retail customers in the marketplace—without Sazerac's interference.

### As RNDC Works to Grow Sazerac's Business, Sazerac Makes Other Plans

101.     In the last quarter of 2022, RNDC's message to its personnel was "full steam ahead" on the Sazerac relationship. This meant—in addition to the customer relations and merchandising

work RNDC had continued to perform in the prior $8.50 per case era—RNDC resumed providing large-scale distribution services, investing heavily in Sazerac promotional events and equipment, and building Sazerac's brands. RNDC's regional and national leaders met regularly with their Sazerac counterparts to develop business plans extending well into 2023. RNDC also stepped up efforts to win new business and gain new retailer accounts on Sazerac's behalf in the latter part of 2022. Meanwhile, at the executive level, RNDC continued to provide Sazerac with thoughtful proposals for a new agreement satisfying Sazerac's desire for a new business model.

102.    During this period, no one at Sazerac gave RNDC leadership any indication that RNDC would soon no longer be Sazerac's primary distributor across the country. Indeed, if they had given RNDC any idea that Sazerac planned to terminate RNDC at the end of 2022, RNDC would not have invested tens of millions of dollars in Sazerac inventory and promotions for 2023, and would not have continued to allow the automatic sweeping of its accounts to pay for product unilaterally ordered by Sazerac.

103.    In fact, rather than give RNDC any indication of Sazerac's plans, in a December 2, 2022 email—after receiving yet another proposal from RNDC on a go-forward agreement—Sazerac's Chief Commercial Officer, Jake Wenz, assured RNDC that Sazerac remained willing to discuss a go-forward agreement and consider RNDC's proposals in 2023. Meanwhile, throughout the last four months of 2022, Sazerac's inventory-ordering personnel—who had access to RNDC's product-demand forecasts—continued to unilaterally order substantial volumes of Sazerac product on RNDC's behalf. In so doing, Sazerac knowingly represented to RNDC that RNDC would remain Sazerac's distributor long enough and on a geographic scale sufficient to sell these mass quantities of ordered product.

104.    In reliance upon Sazerac's statements and conduct, RNDC continued to accept large quantities of Sazerac inventory and believed throughout the latter part of 2022 that the parties were negotiating in good faith towards a new agreement. But it is now clear that while RNDC was building inventory and developing strategies to ensure a successful 2023, Sazerac was assembling dozens of new distributors and brokers across the country to replace RNDC in all but two of the 30+ markets where they were still doing business.

105.    On December 30, 2022—the Friday before the long New Year's holiday weekend—Sazerac delivered to RNDC a notice of termination of the parties' distribution relationship in 30 markets and certain counties, to take effect on January 31, 2023 (the "Termination Notice"). As a result, beginning February 1, 2023, RNDC would only serve as Sazerac's distributor in two states, Georgia and New Mexico. Accompanying this termination letter was an assurance by Sazerac's General Counsel, Maurice Loebl, that "Mark [Brown, President and CEO of Sazerac] will be in touch next week to discuss transition." To date, and despite repeated requests for him to do so, Mr. Brown has yet to reach out to any RNDC executive or owner "to discuss the transition."

106.    Then, an hour after terminating its relationship with RNDC in 30+ markets and without discussing the contents of any public statements concerning the termination, Sazerac issued a press release, which was then communicated to the entire alcohol beverage industry through Sazerac's own daily "news bulletin," the "*Industry News Report*."[7] In this press release, Sazerac identified the two dozen distributors it had already lined up to replace RNDC in the 30+

---

[7] As background, Sazerac's President and CEO, Mark Brown, on a daily basis, prepares and distributes through email its "*Industry News Report*" to a large majority of the alcohol beverage industry members and ancillary businesses in which it collects "newsworthy" information and matters of interest to the alcohol beverage industry. Importantly, however, on this extremely rare occasion, Mr. Brown decided to blast out a second, special edition of its "*Industry News Report,*" after it had already released its December 30, 2022 "*Industry News Report*" earlier in the day, to "announce" that "*Sazerac Company Announces Changes to its United States Route-to-Market*"; this was the only "story" contained in this special edition of the "*Industry News Report*."

former RNDC markets across the country. It was now clear that Sazerac was merely buying itself time through bad faith "negotiations" and other wrongful conduct in order to find new distributors evidently more willing to agree to Sazerac's unsustainable demands. And to date, the Sazerac "press release" is the only communication by a Sazerac executive RNDC has received identifying the successor distributors taking over the distribution of Sazerac product in each terminated market.

### *Sazerac Breaches the Distribution Agreement*

107.    RNDC was, without question, harmed by Sazerac's abrupt, unreasonable 30-day termination of the parties' long-standing relationship in over 30 markets. But from December 30, 2022, to January 31, 2023 (the "Transition Period"), RNDC's message to its personnel remained clear: continue to work hard and conduct ourselves with integrity. From the outset, RNDC's goal was to keep selling its unsold Sazerac inventory throughout the Transition Period and ensure as little disruption as possible to the retail customers who had long been served by RNDC. To that end, within days of receiving the Termination Notice, and since Mr. Brown had yet to reach out to RNDC executives to discuss the transition as promised, RNDC requested that Sazerac executives contact RNDC to promptly discuss the transition of the business to Sazerac's two dozen replacement distributors.

108.    Unfortunately, Sazerac took a far different approach. Having already failed to provide RNDC with reasonable notice of its termination of the Distribution Agreement, Sazerac next turned its attention towards impeding RNDC's efforts to ensure a smooth transition of the business and inventory. RNDC repeated its invitation for a conversation at the executive level numerous times during the Transition Period, but again to no avail. Throughout the Transition

Period, Sazerac executives flatly refused to engage in any discussions with RNDC as to the transition of Sazerac's portfolio to Sazerac's many successor distributors.

109.    Sazerac's motives for refusing to cooperate in forming a transition plan soon became clear. In the industry, typically when a supplier terminates a distributor—either as to a certain market or a certain product—it is usual and customary for the supplier to assist the terminated distributor in facilitating the efficient and timely transition of inventory from the terminated distributor to the successor distributor. Because transition of inventory necessarily comes at a cost to the terminated distributor, RNDC (like most distributors) charges a laid-in-cost per-case handling fee for costs RNDC incurs—for example, the costs of collecting, counting, documenting, and transferring product to the successor distributor. Of course, the supplier's (i.e., Sazerac's) participation is critical to making this arrangement work, as is the successor and terminated distributors' (here, RNDC).

110.    But rather than assist in facilitating the transfer of RNDC's voluminous Sazerac inventory—which at the beginning of January 2023 exceeded $123 million worth of inventory— to its new distributors consistent with industry custom, Sazerac intentionally interfered with RNDC's ability to sell Sazerac products or transfer them to the successor distributors. Immediately after issuing the Termination Notice (and possibly before), Sazerac apparently began to inundate its replacement distributors with new Sazerac product inventory and, by doing so, actively encouraged them ***not*** to purchase unsold inventory from RNDC—much less to pay the handling fee to which RNDC is entitled.

111.    RNDC's struggle to sell Sazerac product was further compounded by Sazerac permitting its replacement distributors to begin selling Sazerac products ***during*** the Transition Period and prior to February 1, 2023. Indeed, during the Transition Period, some large retailers'

ordering systems stopped allowing RNDC to sell them Sazerac products going forward—a process known as being "turned off." Simultaneously, Sazerac's own MDM/MDR employees in certain markets, including Kentucky, spent the Transition Period usurping RNDC's role by soliciting orders from retailers in direct violation of state statutes.

112.    Sazerac's conduct is in direct violation of the terms of the parties' then-effective Distribution Agreement, an essential term of which was that Sazerac would provide RNDC with Sazerac product so that RNDC could sell that product in the marketplace—*without Sazerac's interference*. Even in the event of a termination, industry custom dictates that any unsold inventory as of the effective date of termination would be transitioned to the successor distributor at laid-in-cost.

113.    Despite Sazerac's interference, RNDC has made every reasonable effort to mitigate its substantial losses and damages by selling its remaining Sazerac inventory. In addition to accomplishing strong sales numbers in the ordinary course of business throughout January, RNDC affirmatively reached out to every one of Sazerac's successor distributors (without any assistance or coordination from Sazerac) during the Transition Period, offering to sell them inventory at cost plus the industry-standard handling fee. RNDC extended the same offer to Sazerac. Unsurprisingly, because Sazerac had already insisted that its replacement distributors purchase new product from Sazerac, these new distributors had no incentive, space, or resources to purchase RNDC's unsold inventory. For its part, Sazerac has failed to (i) purchase RNDC's substantial inventory of paid-for Sazerac product, (ii) allow the transfer of the unpaid-for inventory back to Sazerac, and/or (iii) require its new distributors to purchase this inventory.

114.    Sazerac's actions are particularly egregious in light of Sazerac's unilateral control of RNDC's inventory ordering through its VMI system. In the latter part of 2022, before Sazerac

issued the Termination Notice, Federman, Colbert, and Boyd continued to make assurances on phone calls with and in emails to their RNDC counterparts that Sazerac would order inventory consistent with a 40 to 45 days-on-hand metric (including on weekly Zoom meetings on Thursday mornings and an email dated November 9, 2022). Despite these assurances, in late 2022 Sazerac continued to order too much product on RNDC's behalf, far exceeding the 40 to 45 days-on-hand target, all the while knowing that Sazerac intended to terminate RNDC in short order and that RNDC would have no meaningful opportunity to sell the mass quantities of inventory ordered by Sazerac. In the last four months of 2022 alone, Sazerac saddled RNDC with over $552 million in Sazerac inventory. And yet upon issuing the Termination Notice, Sazerac immediately refused to assist RNDC in any way with transfers to new distributors and impeded RNDC's ability to offload its remaining Sazerac inventory.

115.    In short, under false pretenses, Sazerac fraudulently induced RNDC to accept inventory, forced RNDC to pay for the inventory, forced RNDC to use valuable warehouse space and personnel to house the inventory, and is now forcing RNDC to hold on to the inventory with little hope of fully recouping the amounts it paid for the product (other than through this litigation), much less recognizing any profit from the inventory. At the same time, Sazerac has apparently been insisting that its new distributors purchase inventory from Sazerac alone—allowing Sazerac to realize substantial additional revenue through duplicate sales.

### *RNDC's Damages*

116.    Wasting no time after issuing the Termination Notice, Sazerac also began publicly disparaging RNDC in the press and in the market. Based on the information presently available to RNDC, Sazerac's ongoing disparagement includes, but certainly is not limited to: (i) falsely attributing statements to customers about RNDC's refusal to sell Sazerac products—only to have

such customers later refute having said anything of the sort; (ii) trying to induce customers to sign false declarations containing untrue statements about RNDC's conduct; and (iii) authoring a litany of threatening letters to RNDC containing wide-ranging allegations of misconduct but refusing to provide valid proof when questioned.

117.    Sazerac then hastily filed the instant litigation, less than two weeks after issuing its Termination Notice, to give itself a platform for more widespread—but still unsubstantiated—disparagement of RNDC. As a threshold matter, though these allegations have nothing to do with Sazerac's actual stated causes of action, Sazerac devotes substantial effort in its Complaint to attributing its creation of the MDR/MDM Program to RNDC's alleged poor performance as Sazerac's distributor during the last few years. But Sazerac originally developed the MDR/MDM Program to strip *all* its distributors—not just RNDC—of their typical and, in many states, legally-mandated distributor functions regardless of performance. And despite terminating its relationship with RNDC, Sazerac is continuing in its attempts to grow the MDR/MDM Program. It is also generally understood that the new distributors Sazerac engaged to replace RNDC will serve a limited distribution role focused on order fulfilment and delivery, purportedly to be supplemented by Sazerac's own MDR/MDM team. Of course, if it were true that RNDC's performance created the need for the MDR/MDM Program, Sazerac would no longer need the program in terminated markets.

118.    Moreover, the entire basis of the causes of action stated in Sazerac's Complaint is alleged non-payment by RNDC. It is true that, consistent with RNDC's standard process for suppliers transitioning from terminated distributors, RNDC restricted Sazerac's ability to freely transfer (i.e., sweep) funds from RNDC's cash accounts without restriction. This was a necessary and reasonable precaution given the impending termination date (January 31, 2023) and the tens

of millions of dollars owed by Sazerac to RNDC. But unlike Sazerac, RNDC never "stopped" payments. In fact, on the first business day after Sazerac filed its Complaint, a wire payment of over $18 million was sent by RNDC to Sazerac, with a further promise to reconcile what was owed to each party once the termination had played out. Indeed, the large majority of the dollar amounts Sazerac claims as damages had not even become due when Sazerac filed its Complaint.

119.    All told, Sazerac's conduct since December 30 reveals its true motives: apparently understanding the industry's likely negative reactions to its new distribution model and poor transition planning, Sazerac has tried to set RNDC up as its scapegoat for its failures. Nonetheless, RNDC made every effort to engage in a cooperative transition, to facilitate an organized transfer of inventory, and to minimize the disruption to RNDC's and Sazerac's customers. If and when Sazerac's business suffers due to the lack of an orderly and streamlined transition, only Sazerac will be to blame.

120.    And although Sazerac alleges non-payment by RNDC, *it is RNDC which is owed money by Sazerac*. In fact, the very monies allegedly owed to Sazerac are for product that was only accepted by RNDC based on Sazerac's own bad faith and fraudulent conduct. Just as it is to blame for its own alleged losses, so too is Sazerac to blame for RNDC's substantial damages. As of the date of this filing, Sazerac owes RNDC tens of millions of dollars in: (i) outstanding amounts payable by Sazerac for costs borne by RNDC in promoting Sazerac products, all of which has been invoiced to Sazerac; (ii) outstanding true-up payments representing the difference between the $8.50 per case rate and RNDC's full margin rate under the Distribution Agreement for distribution services rendered from August 3, 2022, through end of January, 2023; and (iii) unsold inventory forced on RNDC by Sazerac and accepted by RNDC with the expectation of a national distribution

relationship with Sazerac well into 2023. RNDC's unsold inventory damages can be further categorized as follows:

a) **Unrecovered Expenses in Selling Purchased Inventory:** Tens of millions of dollars in inventory already paid for by RNDC, which RNDC will diligently attempt to sell in the market where allowed; RNDC will retain any proceeds from such sales, but Sazerac remains liable for RNDC's costs, expenses and resources incurred and expended in selling such inventory to the extent RNDC is unable to recoup those costs from buyers in the market;

b) **Offset for Expenses Incurred in Selling Inventory:** Additional sums of inventory received but not yet paid for by RNDC (such payment having been excused by Sazerac's misconduct as detailed herein), but which RNDC will likewise attempt to sell and will return to Sazerac any proceeds from such sales, less any costs, expenses and resources incurred and expended by RNDC in obtaining those sales; and

c) **Unsold Products:** To the extent inventory cannot be sold and because Sazerac has failed to re-purchase such inventory, Sazerac is liable for all costs associated with such unsold products, including any payments made to Sazerac for the product and/or incidental costs associated with warehousing and/or transporting the unsold product.

121. The significant sums owed do not even begin to account for the long-standing harm to RNDC's brand from Sazerac's disparaging statements in the market. Nor do they include the substantial amount RNDC has already incurred and will continue to incur in defending against Sazerac's meritless lawsuit.

122. RNDC is entitled to, and will vigorously pursue, every dollar in damages inflicted upon it by Sazerac.

## COUNT I:
## BREACH OF CONTRACT AND BREACH OF WARRANTY

123. RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

124.    The Distribution Agreement, which governed the parties' relationship after the termination of the September 2021 Agreement on August 3, 2022, is a valid contract between RNDC and Sazerac with express and implied terms and warranties established by applicable law.

125.    Sazerac breached the Distribution Agreement and warranties associated therewith by, among other things, (i) failing to provide reasonable notice of termination as to the states terminated by the Termination Notice; (ii) ordering and delivering Sazerac product to RNDC only to later prevent RNDC from selling the same product; (iii) reducing the parties' relationship from 33 markets to 2 markets; (iv) failing to comply with its obligations of good faith and fair dealing; and (v) failing to pay RNDC amounts invoiced to and owed by Sazerac for RNDC's distribution of Sazerac products, all of which is more particularly described above.

126.    RNDC is therefore entitled to recover all actual, consequential, and indirect damages caused by Sazerac's breach, together with reasonable and necessary attorneys' fees, costs and all pre- and post-judgment interest allowed by law.

127.    Despite commercially reasonable efforts to mitigate, RNDC has suffered damages as a result of Sazerac's breach including, but not limited to, (i) tens of millions of dollars in unsold inventory paid for by RNDC; (ii) RNDC's costs and expenses incurred in transfering inventory to Sazerac's new distributors; (iii) RNDC's costs and expenses in storing RNDC's remaining unsold inventory of Sazerac's products; and (iv) amounts invoiced to Sazerac for RNDC's distribution of Sazerac products which remain unpaid by Sazerac, including true-up payments representing the difference between RNDC's full margin rate and the $8.50 per case rate for distribution services rendered from August 3, 2022, through end of January 2023, and promotional/marketing dollars which are due and owing.

## COUNT II:
## UNJUST ENRICHMENT

128.   RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

129.   In the alternative to Count I, above, and to the extent that no express contract between the parties is found by the Court or trier of fact to exist, Sazerac is liable to RNDC for unjust enrichment based upon an implied contract.

130.   Sazerac received benefits at RNDC's expense, appreciated those benefits, and has inequitably retained those benefits without payment for their value.

131.   Specifically, Sazerac breached the parties' implied contract and thereby has been unjustly enriched by among other things: (i) failing to provide reasonable notice of termination as to the markets terminated by the Distribution Agreement; (ii) ordering and delivering Sazerac product to RNDC only to later prevent RNDC from selling the same product; (iii) reducing the parties' relationship from 33 markets to 2 markets; and (iv) failing to pay RNDC amounts owed for RNDC's distribution of Sazerac products, all of which is more particularly described above.

132.   To avoid unjust enrichment to Sazerac, Sazerac must pay (i) RNDC for the value of distribution services provided; (ii) RNDC for the value of unsold inventory for which RNDC has already paid; (iii) RNDC's costs and expenses in storing and/or transferring RNDC's remaining unsold inventory of Sazerac's products; and (iv) RNDC's invoices related to its marketing and promotional efforts that are due and owing. RNDC should be permitted to offset any such amounts found to be owed to Sazerac by the amount due to RNDC.

## COUNT III:
## PROMISSORY ESTOPPEL

133.   RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

134.   In the alternative to Count I, above, and to the extent no express contract between the parties is found by the Court or the trier fact to exist, Sazerac made promises/representations to RNDC, through words and conduct, and failed to disclose related, relevant facts which Sazerac was aware of and that were directly related to decisions RNDC was making, which Sazerac should reasonably have expected to induce action or forbearance on RNDC's part, which did in fact induce such action or forbearance, and injustice can be avoided only by enforcement of Sazerac's promises/representations and/or holding Sazerac liable for its false promises, representations and half-truths.

135.   Specifically, in its ordering of Sazerac product for RNDC, Sazerac promised and misrepresented to RNDC—through words, conduct, and/or half-truths—that (i) Sazerac would order the appropriate amount of inventory based on demand in the marketplace; and (ii) once Sazerac delivered Sazerac product to RNDC, RNDC would be able to sell that product in the market, without obstruction or interference by Sazerac. Sazerac certainly concealed the truth: that it was planning a mass termination that would prevent RNDC from selling the inventory Sazerac represented was needed. Additionally, in ordering the inventory that all parties now know was not needed, Sazerac promised/represented to RNDC that RNDC would remain its distributor in at least those markets and for such a period of time as would be necessary to sell the purchased inventory, and that Sazerac would pay RNDC for its costs incurred in promoting Sazerac products.

136.   RNDC acted in reliance upon Sazerac's promises, representations, and non-disclosures/half-truths by heavily investing in Sazerac product and promotions on behalf of Sazerac, including by accepting tens of millions of dollars' worth of Sazerac inventory which RNDC currently possesses. Sazerac should reasonably have expected RNDC to take such actions in reliance on Sazerac's wrongful conduct.

137.    Injustice can only be avoided by enforcing Sazerac's promises, representations, and half-truths, and by awarding RNDC the damages and other relief to remediate the harm caused by this conduct, including Sazerac's relevant non-disclosures.

## COUNT IV:
## EQUITABLE ESTOPPEL

138.    RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

139.    In the alternative to Count I above, Sazerac made representations to RNDC, through words, conduct, and half-truths, and failed to disclose related, relevant facts which Sazerac was aware of and that were directly related to decisions RNDC was making, which Sazerac expected to induce, or should reasonably have expected to induce, action or forbearance on RNDC's part, which did in fact induce such action or forbearance, and Sazerac is now liable for its false representations, misleading silence, and half-truths on which RNDC relied to its detriment.

140.    Specifically, in its ordering of Sazerac product for RNDC, Sazerac misrepresented to RNDC, through its words, conduct, and half-truths, that (i) Sazerac would order the appropriate amount of inventory based on demand in the marketplace, and (ii) once Sazerac delivered Sazerac product to RNDC, RNDC would be able to sell that product in the market, without obstruction or interference by Sazerac. Sazerac certainly concealed the truth: that it was planning a mass termination that would prevent RNDC from selling the inventory Sazerac represented was needed.  Additionally, in ordering the inventory that all parties now know was not needed, Sazerac promised/represented to RNDC that RNDC would remain its distributor in at least those markets and for such a period of time as would be necessary to sell the purchased inventory, and that Sazerac would pay RNDC for its costs incurred in promoting Sazerac products.

141.    RNDC acted in reliance upon Sazerac's misrepresentations and non-disclosures/half-truths by heavily investing in Sazerac product and promotions on behalf of Sazerac, including by accepting tens of millions of dollars' worth of Sazerac inventory which RNDC currently possesses. Sazerac should reasonably have expected RNDC to take such actions in reliance on Sazerac's wrongful conduct.

142.    Injustice can only be avoided by enforcing Sazerac's representations, and half-truths, and by awarding RNDC damages and other relief to remediate the harm caused by this conduct, including its relevant non-disclosures.

## COUNT V:
## FRAUDULENT INDUCEMENT

143.    RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

144.    Sazerac made material misrepresentations to RNDC including representations that (i) Sazerac would order the appropriate amount of inventory given the expected demand in the marketplace consistent with a 40 to 45 days-on-hand metric; and (ii) that negotiations for a go-forward global agreement protecting RNDC's role as distributor in approximately 30+ markets would continue into 2023. These misrepresentations were material because RNDC would not have accepted substantial volumes of Sazerac inventory nor invested so heavily in Sazerac products and promotions had it known they were false.

145.    The representations were, however, false, and Sazerac knew the representations were false, or made them recklessly with the intent that RNDC rely upon them. Specifically, at the time it made the representations described above, Sazerac knew that it was assembling multiple distributors throughout the country to replace RNDC in 30+ markets, that it would insist upon only

a 30-day termination period, and that it would require its new distributors to buy Sazerac product directly from Sazerac, and thereby prevent RNDC from selling the inventory in the market.

146.    Sazerac further induced action on RNDC's part in reliance upon Sazerac's misrepresentations by, among other things, continuing to deliver tens of millions of dollars' worth of product to RNDC. RNDC acted in reliance upon Sazerac's misrepresentations by heavily investing in Sazerac product and promotions on behalf of Sazerac, including by accepting tens of millions of dollars' worth of Sazerac inventory which RNDC currently possesses.

147.    Sazerac's misrepresentations directly and proximately caused injury to RNDC, which resulted in the following damages: (i) tens of millions of dollars in unsold inventory paid for by RNDC; (ii) RNDC's costs and expenses incurred in transferring inventory to Sazerac's new distributors; (iii) RNDC's costs and expenses in storing RNDC's remaining unsold inventory of Sazerac's products; (iv) RNDC's costs and expenses related to marketing, planned promotions, incentives, and other business development for Sazerac products in late 2022 and 2023, and (v) amounts invoiced to Sazerac for RNDC's distribution of Sazerac products which remain unpaid by Sazerac.

**COUNT VI:**
**FRAUDULENT CONCEALMENT OR NONDISCLOSURE**

148.    RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

149.    Sazerac possessed new information and facts that were unknown to RNDC which made Sazerac's partial representations to RNDC false and/or misleading. Specifically, Sazerac deliberately did not disclose to RNDC, among other things, that: (i) Sazerac was planning to deliver its unreasonable 30-day Termination Notice to RNDC thereby replacing RNDC with new distributors in 30+ markets; (ii)  RNDC would be unable to sell the product Sazerac had ordered

and delivered to the market due to Sazerac's this unreasonable 30-day Termination Notice and Sazerac's obstruction of RNDC's sale of its inventory to successor distributors; (iii) Sazerac's unreasonably short Termination Notice and the planned mass termination would prevent RNDC from selling the inventory Sazerac ordered for RNDC; and (iv) RNDC would not remain Sazerac's distributor in at least a sufficient number of markets and for a sufficient period of time as would be necessary to sell the purchased inventory.

150.    RNDC had no knowledge of this information nor an ability to learn it other than directly from Sazerac.

151.    Sazerac had a duty to disclose this information to RNDC because Sazerac had superior knowledge of the true circumstances, and because Sazerac's partial disclosures created the impression of full disclosure.

152.    The information was material because, while Sazerac was making the detailed plans described above to terminate the relationship, RNDC justifiably acted in reliance upon Sazerac's promises, representations and non-disclosures/partial disclosures by heavily investing in Sazerac product and promotions on behalf of Sazerac, including by accepting tens of millions of dollars' worth of Sazerac inventory which RNDC currently possesses.

153.    By deliberately remaining silent, Sazerac caused injury to RNDC, which resulted in the following damages: (i) tens of millions of dollars in unsold inventory paid for by RNDC; (ii) RNDC's costs and expenses incurred in transferring inventory to Sazerac's new distributors; (iii) RNDC's costs and expenses in storing RNDC's remaining unsold inventory of Sazerac's products; (iv) RNDC's costs and expenses related to marketing, planned promotions, incentives, and other business development for Sazerac products in late 2022 and 2023; and (v) amounts invoiced to Sazerac for RNDC's distribution of Sazerac products which remain unpaid by Sazerac.

## COUNT VII:
## NEGLIGENT MISREPRESENTATION

154.    RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

155.    Even though such information was false or misleading, Sazerac represented to RNDC that (i) Sazerac would order the appropriate amount of inventory given the expected demand in the marketplace consistent with a 40 to 45 days-on-hand metric; and (ii) that negotiations for a go-forward global agreement protecting RNDC's role as distributor in approximately 30+ markets would continue into 2023. These misrepresentations were material because RNDC would not have invested so heavily in Sazerac products and promotions had it known they were false.

156.    Sazerac should have known that RNDC would justifiably rely on these representations and act accordingly, which RNDC did to its detriment—including by heavily investing in Sazerac product and promotions and accepting tens of millions of dollars' worth of Sazerac inventory which RNDC currently possesses.

157.    Based on the above, Sazerac did not use reasonable care in communicating with RNDC.

158.    Sazerac's misrepresentations proximately caused injury to RNDC, which resulted in the following damages: (i) tens of millions of dollars in unsold inventory paid for by RNDC; (ii) RNDC's costs and expenses incurred in transferring inventory to Sazerac's new distributors; (iii) RNDC's costs and expenses in storing RNDC's remaining unsold inventory of Sazerac's products; (iv) RNDC's costs and expenses related to marketing, planned promotions, incentives, and other business development for Sazerac products in late 2022 and 2023; and (v) amounts invoiced to Sazerac for RNDC's distribution of Sazerac products which remain unpaid by Sazerac.

**COUNT VIII:**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY AND/OR BUSINESS RELATIONSHIPS**

159.    RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

160.    RNDC has valid and long-standing business relationships as well as multiple business expectancies with numerous alcohol beverage product suppliers, retailers, and distributors due to its nationwide presence, history in the alcohol beverage industry, and earned good will.

161.    Sazerac, as a longtime supplier of alcohol beverage products previously distributed by RNDC nearly nationwide, has direct knowledge of most, if not all, the companies, entities, and individuals with which RNDC has its aforementioned long-standing business relationships and business expectancies.

162.    Upon terminating its business relationship with RNDC, Sazerac intentionally, and without proper motive or justification, engaged in acts of interference with the companies, entities, and individuals with which RNDC has had long-standing business relationships and/or business expectancies. Specifically, Sazerac has (i) defamed RNDC directly to these entities or in a manner in which it knew or should have known would reach these entities; (ii) communicated falsehoods and misrepresentations about RNDC directly to these entities or in a manner in which it knew or should have known would reach these entities; (iii) interfered with RNDC's ability to adequately distribute alcohol beverage products to existing retailer customers; and/or (iv) otherwise intentionally disrupted or jeopardized RNDC's current and/or future relationships. For example, Sazerac deliberately caused its new distributors to accept product from Sazerac, rather than purchasing RNDC's remaining unsold inventory of Sazerac products from RNDC.

163. As a result of Sazerac's intentional and wrongful interference, Sazerac has caused RNDC damage by causing the loss of business relationships and/or business expectancies in the alcoholic beverage industry and/or otherwise causing significant damage to those relationships and/or expectancies.

164. As a result of Sazerac's continued intentional and wrongful interference, the loss to RNDC of business relationships and/or business expectancies in the alcohol beverage industry is ongoing. If Sazerac's conduct continues, it will irreparably harm RNDC by permanently endangering and/or eliminating RNDC's business relationships and/or business expectancies in the alcohol beverage industry.

165. For the reasons described in this Count and more broadly in RNDC's Answer and Counterclaims, RNDC has a strong likelihood of succeeding on the ultimate merits on this tortious interference claim, as well as on RNDC's other claims and defenses.

166. RNDC requests that the Court issue an injunction enjoining Sazerac from defaming, disparaging, or otherwise intentionally disrupting or jeopardizing RNDC's retailer relationships.

**COUNT IX:**
**NEGLIGENCE PER SE/DAMAGES PURSUANT TO K.R.S. § 446.070**

167. RNDC hereby repeats, realleges, and incorporates the foregoing paragraphs as if fully set forth herein.

168. For the reasons detailed above, Sazerac has violated numerous Kentucky statutes[8] applicable to alcohol beverages. Specifically, by curtailing its distributors' (including RNDC's) distributor role and instead seeking to control and conduct ordering, sales, and merchandising of Sazerac products, Sazerac has violated K.R.S § 244.240(1)(a) (prohibiting distillers or wineries

---

[8] Furthermore, based upon RNDC's reasonable information and belief, Sazerac is violating multiple other states' laws substantially similar three-tier laws to the Kentucky laws outlined herein in connection with Sazerac's continued use of their MDM/MDR Program with its new distributors.

from "be[ing] interested directly or indirectly in any way in any premises where distilled spirts or wine is sold at retail or in any business devoted wholly or partially to the sale of distilled spirts or wine at retail . . . "); K.R.S § 243.030 and K.R.S § 243.110(1) (which together prohibit license-holders in the state's three-tier system from acquiring licenses in separate tiers so as to prevent the same or related entities from operating in different tiers at the same time); K.R.S § 243.130 (which requires distillers and wineries to only make sales of distilled spirits and wine products at wholesale to other supplier tier entities or to wholesalers, and subject to certain exceptions, prohibits distillers and wineries from selling or contracting to sell, give away, or deliver any of its products to any retailer or consumer in Kentucky); K.R.S § 244.060 (which prohibits the purchase and sale from, or to, an entity who is not licensed to sell or to buy and receive the alcoholic beverages being purchased and sold); and K.R.S. § 244.167(1)(c) (which provides that retailers may only order and purchase alcohol beverages from a licensed wholesaler).

169.    RNDC, as a distributor, is among the class of persons intended to be protected by Kentucky's three-tier laws, which include the statutes identified above.

170.    Kentucky's three-tier laws, including the statutes identified above, were specifically intended to prevent participants in the three-tier system from engaging in conduct reserved for a separate tier. *See* 804 Ky. Admin. Regs. 4:015, § 2 ("A manufacturer shall not have or acquire a substantial interest in the establishment, maintenance, or operation of the business of a wholesaler or a retailer."). A prohibited "substantial interest" is defined under this regulation in Section 1(3)(d) to include "[a]ny other direct or indirect interest which provides an ability to control or influence decisions by a business, sole proprietorship, partnership, corporation, limited liability company, limited liability partnership, or other legal entity."

171.     Sazerac's actions in usurping RNDC's role as distributor were a substantial factor in causing RNDC's injuries, including the damages RNDC has suffered in the form of (i) loss of the Sazerac business in Kentucky due to Sazerac's insistence on circumventing the three-tier system and Kentucky law and interfering with RNDC's relationships and sales in Kentucky; (ii) inventory paid for by RNDC for prospective sales in Kentucky; (iii) RNDC's costs and expenses in storing RNDC's remaining unsold inventory of Sazerac's products in Kentucky; and (iv) costs and expenses of promotional activities RNDC implemented for Sazerac in the State of Kentucky.

172.     Pursuant to K.R.S. § 446.070, RNDC is entitled to recover damages by reason of Sazerac's violation of the aforementioned statutes.

## RNDC'S PRAYER FOR RELIEF

RNDC, reserving its right to amend its pleadings to add additional defenses, affirmative defenses, and counterclaims, prays that the Court:

a) enter judgment in RNDC's favor and against Sazerac on all counts raised by its Counterclaims as described herein;

b) award RNDC money damages for all damages sustained as a result of Sazerac's wrongful conduct described herein, including its acts or omissions, in an amount to be proven at trial;

c) award RNDC punitive damages in an amount to be determined by the trier of fact herein;

d) award RNDC all of its attorneys' fees and costs incurred in connection with prosecuting and defending the claims made in this lawsuit;

e) issue an injunction ordering Sazerac to immediately cease all tortious interference with RNDC's retailer relationships;

f) award RNDC all pre-judgment and post-judgment interest allowed by law; and

g) grant RNDC all other and further relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

Dated: March 17, 2023

NORTON ROSE FULBRIGHT US LLP

By: */s/ Richard S. Krumholz*
    Richard S. Krumholz
    richard.krumholz@nortonrosefulbright.com
    Veronica Portillo Kendrick
    veronica.kendrick@nortonrosefulbright.com
    2200 Ross Avenue, Suite 3600
    Dallas, TX  75201-7932
    Telephone:(214) 855-8000
    Facsimile: (214) 855-8200

    Charles E. English Jr.
    E. Kenly Ames
    ENGLISH LUCAS PRIEST & OWSLEY, LLP
    1101 College Street; P.O. Box 770
    Bowling Green, KY 42101
    Telephone:  (270) 781-6500
    Facsimile:  (270) 782-7782
    E-mail:  benglish@elpolaw.com
    E-mail:  kames@elpolaw.com

    ***Attorneys for Defendant and Counter-Plaintiff Republic National Distributing Company, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Anne K. Guillory – anne.guillory@dinslaw.com
Philip E. Cecil – philip.cecil@dinsmore.com
Andrea Ahn Wechter – wechter.andrea@dorsey.com
Gregory S. Tamkin – tamkin.greg@dorsey.com
Maral Shoaei – shoaei.maral@dorsey.com


                                        */s/ Veronica Portillo Kendrick*
                                         Veronica Portillo Kendrick