UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| SAZERAC COMPANY, INC., | ) |
| | ) |
|     Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | ) CIVIL ACTION NO: 3:23-CV-25-GNS |
| | ) |
| REPUBLIC NATIONAL DISTRIBUTING | ) |
| COMPANY, LLC, | ) |
| | ) |
| | ) |
|     Defendant/Counterclaim Plaintiff | ) |
| | ) |

**<u>SAZERAC COMPANY, INC.'S MOTION TO COMPEL</u>**

Sazerac Company, Inc. ("Sazerac"), by and through its undersigned counsel, respectfully moves this Court for an order compelling Republic National Distributing Company, LLC ("RNDC") to produce complete, unredacted copies of relevant documents, as well as production of any related documents and to identify suppliers that RNDC replaced Sazerac products with during the parties' relationship.  In support thereof, Sazerac states as follows:

**<u>INTRODUCTION</u>**

This lawsuit arises from RNDC's failure to pay Sazerac tens of millions of dollars for products that it ordered as Sazerac's distributor, received and then re-sold to retail.  Sazerac and RNDC had a long history of working together that had been deteriorating over time.  In September 2021, the parties sought to improve their relationship by entering into a written global agreement.  But, by mid-2022, RNDC terminated that agreement and resumed its pattern of underperformance as Sazerac's distributor in numerous states.  Ultimately, Sazerac notified RNDC, on December 30, 2022, that it was terminating the parties' relationship in most of the states in which RNDC was serving as a distributor, effective February 1, 2023.  During the month-long period prior to the

termination date, RNDC refused to pay for the products it purchased and began swapping out Sazerac brands for competitor brands, rather than continuing to perform as Sazerac's distributor during that time. To facilitate the switch to competitors while still technically serving as Sazerac's distributor,  RNDC put together and circulated "Sazerac Attack Plans", "Pull n' Plug" spreadsheets, "Sazerac Update & Swap List," "Sazerac Witch Win," and "Substitution/Replacements for Sazerac"— noting the supplier, brands, and products to replace Sazerac.  It immediately contacted Sazerac's competitors to accomplish the change-over.  That is, instead of working as Sazerac's distributor and continuing to sell remaining Sazerac inventory, RNDC started taking action to preclude its own sales of Sazerac products by replacing them with competing products.

One of the results of RNDC's swapping out of Sazerac products with those of other suppliers' was that RNDC ended up with more inventory after the notice period than it otherwise would have had RNDC continued to act as Sazerac's distributor during that time.  Despite its own actions, RNDC filed nine legal and equitable counterclaims against Sazerac, including blaming Sazerac for the excess inventory that its own conduct created and asserting that the inventory was the result of Sazerac's not providing RNDC with a reasonable termination period so that RNDC could have sold off the Sazerac inventory.

A fundamental issue in the case is, to the extent that RNDC had excess inventory, the inventory was a result of RNDC's own conduct and own failures to serve as a distributor once terminated.  Simply put, RNDC cannot claim to be harmed by Sazerac when RNDC was actually causing harm to itself, including by failing to reduce its Sazerac inventory during the termination period and then claiming that Sazerac owes RNDC money for the products that it did not sell or transfer.  Likewise, Sazerac has asserted a defense of unclean hands based on RNDC's actions to

swap out and harm Sazerac while purportedly acting as its distributor. RNDC has in turn argued that it did not swap out products during the termination period but waited until after the effective termination date, of February 1, 2023, to do so.

Sazerac has attempted to seek discovery in connection with RNDC's conduct, including documents relevant to RNDC's swapping out of Sazerac products with other suppliers' products pursuant to RFP Nos. 47 and 55, and information as to the timing of any instructions, directions, or directives provided to its employees to replace Sazerac products with other suppliers' products during the time in which RNDC was still Sazerac's distributor pursuant to Interrog. No. 20. In response to Sazerac's written discovery requests, RNDC produced 326[1] documents with extensive redactions purportedly based on assertions that the redacted portions were irrelevant and proprietary. Both arguments lack merit and do not justify the redactions made. Further, RNDC did not provide information as to the timing of when it began discussing or actually replacing Sazerac products with other suppliers' products, including the instructions, directives, or directions it gave to its employees after December 30, 2022, and must fully respond to the request.

*First*, with respect to relevance, the 326 redacted documents appear to directly relate to the suppliers and brands that RNDC swapped out Sazerac's brands with, supplier priorities, and inventory of Sazerac products. *See* **Ex. 1**, Summary of Redacted Documents. Despite alleging that RNDC primarily swapped out Sazerac with competing supplier's products *after* the February 1, 2023 termination date (despite these lists having been prepared and circulated immediately after Sazerac's termination notice), RNDC redacted information relating to *when* such swaps actually took place. But, that information goes to Sazerac's defenses rebutting RNDC's purported claimed

---

[1] RNDC produced 626 documents with redactions, but for the purposes of this Motion, Sazerac only seeks production of 326 documents.

damages based on RNDC's failure to mitigate its damages from any purported "excess inventory" and unclean hands.  Indeed, even RNDC's witnesses could not testify about these documents based on their confusion and inability to understand the documents due to RNDC's redactions resulting in lack of information.  Further, it is not just the timing of the swaps that must be unredacted, but also the supplier names and other information related to the swaps that took place.  That is, similar to RNDC's service of over 20+ subpoenas on Sazerac's successor distributors, Sazerac has the right to fact check RNDC's assertions and alleged date(s) of swapping out Sazerac products with other suppliers rather than having to rely on RNDC's own self-serving statements and requires such information.

*Second*, the parties entered into a confidentiality agreement which allows RNDC to designate extremely sensitive documents that would create a substantial risk of serious harm if disclosed as "Highly Confidential – Attorney's Eyes Only." Both parties have relied on and used this designation to produce documents throughout discovery, including thousands of documents that Sazerac produced concerning the successor distributors that replaced RNDC—i.e. RNDC's direct competitors. There is simply no reason why RNDC should be permitted to preclude Sazerac's complete discovery concerning the suppliers that RNDC acted with and for to harm Sazerac's business while serving as Sazerac's distributor during the termination period.  RNDC has demanded and obtained from Sazerac production of documents containing highly competitive and proprietary information as to 20+ of RNDC's own competitors (and in fact seeks even more now, seeking to compel Sazerac's production of any and all documents related to these distributors, *regardless of relevance*, in its own competing motion to compel).

*Third,* not only has RNDC redacted the necessary timing information from its documents but RNDC has also failed to respond fully to an interrogatory to provide information as to the

4

timing of its actions swapping out Sazerac's products for other suppliers' products. Regardless of whether the redacted documents contain such information, RNDC must fully respond to the discovery requests with information related to the timing of the swaps.

***Finally***, regardless of the above, RNDC must identify and disclose, under its Rule 26(a)(1) obligations, the identities of those suppliers that have information relevant to RNDC's claims (that it did not swap out Sazerac products until following February 1, 2023) and Sazerac's defenses (that RNDC worked with other suppliers to swap out Sazerac products during the termination period between December 30, 2022 and February 1, 2023).

Accordingly, the Court should order RNDC to: (1) produce unredacted versions of the 326 documents identified in Exhibit A; (2) fully respond to Sazerac's discovery requests, including production of any additional documents responsive to RFP Nos. 47 and 55 and a complete response to Interrog. No. 20, including the timing of RNDC's actions; and (3) identify the identities of those suppliers that have information relevant to RNDC's claims and Sazerac's defenses, including information concerning the swapping out of Sazerac products and the related timing.

**RELEVANT BACKGROUND**

**A.      The Parties' Relationship and this Lawsuit**

Sazerac is family-owned, privately held leading distiller of spirits, with a portfolio of approximately 400 brands spanning a wide variety of spirits. Compl. [Dkt. 1], ¶ 9. RNDC is a distributor of wine and spirits in the United States. *Id*., ¶ 10. For over a decade, Sazerac worked with RNDC for the distribution of its products in more than half the states in the country. During the last several years of the parties' relationship, Sazerac asked RNDC to improve its efforts to market and sell Sazerac products. *See id*., ¶ 12. RNDC, however, did not take sufficient steps to improve, many of which would have required a new structure and change in incentives for its

salespeople. Ultimately, Sazerac notified RNDC that it would be building and training its own marketing force to do most of the marketing work that it had been paying RNDC to do, but which Sazerac felt it was not receiving. *Id.*, ¶ 15.

To address the fact that RNDC was performing a reduced role and Sazerac was investing in a larger marketing team that would improve the volume of sales by which both companies would benefit, on or about September 23, 2021, the parties entered into a global distribution agreement (the "2021 Global Agreement"). *Id.*, ¶ 16. That agreement was heavily negotiated. RNDC would earn a flat per case fee on all cases of Sazerac products, effective September 1, 2021, with certain bonus payments that would be earned based on volume growth. *See id.* But, the new margin structure would help fund the new and necessary marketing program.

Shortly after the parties entered into the 2021 Global Agreement, RNDC began expressing dissatisfaction with the terms of the agreement. *Id.*, ¶ 18. Ultimately, on June 3, 2022, **RNDC** terminated the parties' 2021 Global Agreement, effective August 3, 2022, resulting in a reversion to the pre-agreement pricing which effectively required Sazerac to pay both RNDC, who had been underperforming, and its new marketing team, retained to make up for RNDC's deficiencies. *See* **Ex. 2**. As a result of RNDC's termination, Sazerac began looking into alternative distributors. In August and September 2022, Sazerac notified RNDC that it was switching distributors in Colorado, Washington, and Michigan. Nevertheless, RNDC failed to address Sazerac's prior concerns and began developing plans to replace Sazerac products in those states. *See* Dkt. 1, ¶ 22. The parties never reached a new agreement to replace the global agreement, and on December 30, 2022, Sazerac sent a 30-day notice to end the parties' relationship in all but two states, effective February 1, 2023. *Id.*, ¶ 24.

6

Within days of the termination, RNDC stopped paying for the more than $70 million of inventory it had received from Sazerac. Further, RNDC began immediately swapping out Sazerac brands with those of other suppliers in these terminated states, despite continuing to serve as Sazerac's distributor until February 1. However, rather than pay the amounts due or continue to sell and promote Sazerac's brands as part of its distribution duties, RNDC brought nine counterclaims for damages, including claiming that it was stuck with excess Sazerac inventory as of February 1, 2023, despite its own improper actions. *See* Dkt. 24.

**B.      Discovery and Related Conferrals**

The parties began discovery on April 14, 2023, whereby Sazerac served its first set of requests for production and interrogatories. On about July 7, 2023, the parties entered into a Confidentiality and Non-Disclosure Agreement ("Confidentiality Agreement") governing the designation and use of materials produced in this case. **Ex. 3**. As part of that agreement, the parties agreed to designate documents "which would create a substantial risk of competitive harm that could not be avoided by less restrictive means" as "Highly Confidential – Attorney's Eyes Only." *Id*. at 2, ¶ 3(C). The parties further agreed that documents which such designation shall be disclosed to only a limited set of people, excluding all Sazerac individuals. *See id*. at 7, ¶ 5(B).

Further, on January 12, 2024, Sazerac served its Third Set of Requests for Production and its Second Set of Interrogatories. *See* **Exs. 4 and 5**. Sazerac sought production of "all documents and communications reflecting, concerning and/or relating to any and all instructions, directions, directives, requirements, advice, and/or suggestions drafted by RNDC…concerning the replacement of Sazerac products with non-Sazerac products at retailers (such as "Sazerac Knockout Brands" documents or charts listing "Sazerac Product" and corresponding "Replacement" non-Sazerac products) or the discontinuation of sales of Sazerac products." *See*

Ex. 4, RFP No. 47.  Sazerac also sought production of all "documents and communications reflecting, concerning, and/or relating to deprioritizing Sazerac products compared to products from other suppliers, or otherwise changing prioritization of Sazerac products, since January 1, 2021 to the present."  *See id.*, RFP No. 55.  In response, RNDC indicated that it had already produced all responsive documents to these requests.  *See id.*

Sazerac further requested RNDC to "describe in detail, ***including the timing***, any and all instructions, directions, directives, requirements, advice, and/or suggestions provided by RNDC to either its employees (including its sales personnel) or any retailer(s), between January 1, 2021 and the present, related to or concerning the replacement of Sazerac products with non-Sazerac products at retailers or the discontinuation of sales of Sazerac products."  *See* Ex. 5, Interrog. No. 20 (emphasis added).  On March 22, 2024, RNDC responded, in part, that "[a]fter Sazerac notified the termination of RNDC in Washington and Colorado in August 2022 and in most remaining markets on December 30, 2022, certain RNDC employees discussed plans to replace the then-terminated Sazerac business, and RNDC moved to protect and continue its distribution business with as little interruption as possible."  *See id.*  RNDC, however, did not provide any substantive response for any action it took after December 30, 2022 and failed to identify when it began swapping out Sazerac products.  *See id.*  Relatedly, Sazerac served 30(b)(6) topics on RNDC regarding actions taken by RNDC representative in response to Sazerac's termination notice, including "replacing Sazerac products on retailer shelves with RNDC's other products during the transition period" and "RNDC's efforts to sell its inventory of Sazerac products" after the termination notice.  *See* **Ex. 6**, Topics 30 and 51.

On April 11, 2024, counsel for Sazerac attempted to use several RNDC redacted documents, including a "Pull n' Plug" spreadsheet and "Colorado brand attack" spreadsheet during

the deposition of Kris Patten, RNDC's Vice President of Supplier Business Development. While Mr. Patten had sent these documents and was able to testify as to their purpose, including how they would include information regarding replacing Sazerac brands with other brands, he could ***not*** testify to any of their specific contents due to RNDC's extensive redactions, including any of the replacement supplier names or brands. *See* **Ex. 7**, Deposition Ex. 286; **Ex. 8**, K. Patten Dep. Tr. at 48:3-50:10. He also could not independently testify about the timing of the swaps. *See, e.g.,* Ex. 8 at 42:2-43:8. Chris Little, RNDC's Vice President of National Accounts, likewise subsequently testified about RNDC's tracking of suppliers and brands that were swapped in, noting that such charts would indicate when the replacement/swapping actually became effective (i.e. whether they took effect prior to or after February 1, 2023). *See* **Ex. 9**, C. Little Dep. Tr. at 296:7-298:8. In turn, on April 23, 2024 Sazerac requested that RNDC reproduce unredacted versions of all "Pull n' Plug" spreadsheets, as well as all similar documents, including but not limited to ones relating to supplier priorities, transition/replacement of Sazerac products, and inventory of Sazerac products. **Ex. 10**[2]. Of course, to the extent that the tracking charts described by Mr. Patten and Mr. Little were not actually produced, such documents must be produced in response to the discovery requests. On May 7, RNDC rejected Sazerac's request claiming that the "identities of suppliers and brands RNDC used to replace Sazerac products" were not relevant. *See* **Ex. 11**.

On May 22, 2024, counsel for the parties conferred telephonically. **Ex. 12**, Declaration of Maral J. Shoaei ("Shoaei Decl."), ¶ 4. During that call, counsel for Sazerac stressed the importance of knowing the supplier names that RNDC swapped Sazerac with and the dates for RNDC's actions as they are relevant to RNDC's claims concerning excess inventory and RNDC's unclean

---

[2] Sazerac also attached a list of the supporting exhibits to its April 23 letter identifying the documents by bates numbers and color-coded them based on categories. The "green" highlighted documents are largely the ones at-issue in this Motion.

hands. *Id*. at ¶ 5. Sazerac's counsel also indicated that Sazerac has the right to "fact check" any statement by RNDC as to when RNDC began swapping out Sazerac products with other suppliers, just like RNDC has done with the 20+ successor distributors that it subpoenaed in order to "fact check" Sazerac. *Id*. at ¶ 6. Indeed, RNDC's witnesses could not confirm as to which suppliers or as to when RNDC began swapping out Sazerac products, including RNDC's designated 30(b)(6) witness on these issues. *See* **Ex. 13**, W. Jackson Dep. Tr. (RNDC's representative on Topics 30 and 51), at 189:14-193:13. Counsel for RNDC communicated that she understood why at least the dates of the swap were relevant, agreed that such information should not have been redacted and would be provided, and requested that Sazerac provide additional examples. Shoaei Decl., ¶ 7. The next day, on May 23, 2024, counsel for Sazerac provided an additional example of an improperly redacted document by RNDC. *See* **Ex. 14.** On June 18, 2024, RNDC responded and reverted back to its complete refusal to produce documents concerning swapping of Sazerac products with other suppliers—*including* the date of the effective swaps—as being "proprietary" and not relevant to the claims and defenses. *See* **Ex. 15**. Counsel for Sazerac made one last attempt to confer telephonically on June 22nd, to no avail. Shoaei Decl., ¶ 9. Sazerac now seeks to compel RNDC to (1) produce unredacted versions of the 326 documents identified in Exhibit A; (2) fully respond to Sazerac's discovery requests, including production of any additional documents responsive to RFP Nos. 47 and 55 and a complete response to Interrog. No. 20, including the timing of RNDC's actions; and (3) identify the identities of those suppliers that have information relevant to RNDC's claims and Sazerac's defenses, including information concerning the swapping out of Sazerac products and the related timing.

## ARGUMENT

Under Fed. R. Civ. P. 26, a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportionate to the needs of the case...." Fed. R. Civ. P. 26(b)(1).  In evaluating this, a court considers several factors: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id*.  Further, under Fed. R. Civ. P. 37, if a party fails to comply with a discovery request, the requesting party may seek an order from the Court compelling compliance.  Fed. R. Civ. P. 37(a)(2)(B). That includes an order that redactions be lifted.  *See, e.g., Serrano v. Cintas Corp.,* 699 F.3d 884, 900 (6th Cir. 2012) (reversing district court's order denying motion to compel unredacted copies of documents).  The redacting party bears the burden of establishing the propriety of any redaction. *See Deal Wireless, LLC v. Selective Way Ins. Co*., 2016 WL 6651798, at *1 (E.D. Mich. May 4, 2016).  "Redaction is, after all, an alteration of potential evidence. A party should not take it upon him, her or itself to decide unilaterally what context is necessary for the non-redacted part disclosed, and what might be useless to the case." *Evon v. Law Offices of Sidney Mickell*, 2010 WL 455476, at *2 n.1 (E.D. Cal. Feb. 3, 2010).  Here, RNDC has not met its burden of establishing the proprietary of its redactions to the 326 documents identified in Ex. 1.

**First,** its redaction of the 326 documents at-issue are improper because they contain relevant, responsive information.[3]  As noted above, RNDC alleges that Sazerac terminated the parties' relationship with too little notice, and as a result, RNDC was stuck with excess inventory

---

[3] RNDC's assertions that these redactions are proper because they reflect irrelevant information is without merit.  Parties "cannot unilaterally redact portions of documents based on relevancy grounds." *Melchior v. Hilite Int'l, Inc.,* 2013 U.S. Dist. LEXIS 71393, 2013 WL 2238754, at *3 (E.D. Mich. May 21, 2013)

11

after the termination notice period. RNDC also took actions against Sazerac as its distributor, resulting in unclean hands. These documents go directly to the heart of rebutting both RNDC's legal and equitable claims. For instance, the "Pull n' Plug" spreadsheets and various state "attack plans", as well their corresponding communications, identified in Exhibit A expound upon the steps RNDC took to swap out Sazerac products, including which suppliers or brands, as well as which dates. *See* Ex. 8, K. Patten Dep. Tr. at 48:18-51:13 (referring to Deposition Ex. 286, Ex. 7); Ex. 9, C. Little Dep. Tr. at 27:20-28:16; *see also* **Ex. 16**, January 6, 2023 Email; **Ex. 17**, January 9-10, 2023 Email. These documents are relevant to Sazerac's defenses and rebutting RNDC's purported damages, as well as simply responsive to Sazerac's Requests for Production 47 and 55 and Interrogatory 20. This is particularly true since RNDC's own witnesses have testified that RNDC had an "obligation" and "duty" to continue selling Sazerac brands until the termination date. Ex. 9, C. Little Dep. Tr. at 282:23-283:18. Yet, at the same time, RNDC's witnesses, including its corporate representative, could confirm such swap lists exist, but could not identify as to when RNDC began swapping Sazerac products. *See* Ex. 13, W. Jackson Dep. Tr. at 189:14-193:13.

Moreover, it is not just the timing of the swaps that must be unredacted but also the supplier names and other information related to the swaps that took place. That is, similar to RNDC's service of over 20+ subpoenas on Sazerac's successor distributors, Sazerac has the right to fact check RNDC's assertions and alleged date(s) of swapping out Sazerac products with other suppliers rather than having to rely on RNDC's self-serving statements and requires such information.

Further, the relevance of these documents is even more obvious by the fact that RNDC produced them. While RNDC claims that it produced only the "relevant" portions and redacted

12

the purportedly "irrelevant" portions, it is not for RNDC to make sure decisions.  The "Federal Rules of Civil Procedure do not recognize irrelevance as a privilege or an objection that warrants redaction…" *Medtronic Sofamor Danek, Inc. v. Michelson*, 2002 U.S. Dist. LEXIS 27981, at *19 (W.D. Tenn. Jan. 30, 2002); *Osborn v. Griffin*, 2013 U.S. Dist. LEXIS 201060, 2013 WL 12176851, at *8 (E.D. Ky. July 17, 2013) (quoting *Medtronic*, 2002 U.S. Dist. LEXIS 27981); *Beverage Distributors, Inc. v. Miller Brewing Co*., 2010 U.S. Dist. LEXIS 50732, at *4 (S.D. Ohio, Apr. 28, 2010) (finding selective redaction inappropriate and holding that "redaction of otherwise discoverable documents is the exception rather than the rule...")); *Melchior v. Hilite Int'l, Inc*., 2013 U.S. Dist. LEXIS 71393, at *6 (E.D. Mich. May 21, 2013) (producing party "cannot unilaterally redact portions of documents based on relevancy grounds"); *In re Stryker Rejuvenate & ABG II Hip Implant Prods. Liab. Litig*., 2014 U.S. Dist. LEXIS 85201, at *10 (D. Minn. June 20, 2014) ("[T]here is nothing in the Federal Rules of Civil Procedure that permits the unilateral redaction of information, in otherwise responsive documents, that one party or the other deems not relevant.").

Additionally, the Federal Rules also provide various mechanisms to contextualize evidence offered only in partial form. *See, e.g., Fed. R. Evid. 106; United States v. Howard*, 216 F. App'x 463, 472-73 (6th Cir. 2007) (explaining that Rule 106 "allows a party who is prejudiced by an opponent's introduction of part of a document, or a correspondence, or a conversation, to enter so much of the remainder as necessary to explain or rebut a misleading impression caused by the incomplete character of that evidence") (internal citations and quotations omitted).  RNDC cannot benefit from portions of documents while at the same time refusing to provide the full scope of the information in these redacted documents.  Sazerac has the right to review these redactions,

13

determine the scope of their relevance, and take any additional steps needed to check or rebut Sazerac's statements.[4]

***Second***, RNDC has redacted the 326 documents at-issue because they purportedly reflect RNDC's "proprietary" information.  This argument lacks merit.  As a preliminary matter, RNDC has redacted supplier names and brands, and in some instances, dates.  This is not "proprietary" information.  Additionally, even if they were "proprietary", the parties have entered into a Confidentiality Agreement that allows RNDC to produce these documents under a "Highly Confidential – Attorney's Eyes Only" designation which would then be limited to only select people—none of which include Sazerac individuals.  *See* Ex. 3 at 7, ¶ 5(B).  In fact, Sazerac has fully cooperated in RNDC's requests that the parties enter into ***numerous, additional*** confidentiality agreements with each of the third-party distributors that RNDC served subpoenas on in order to permit protection of those separate productions as well.  Simply put, RNDC's redactions render the parties' Confidentiality Agreement superfluous and in such instances, district courts in this Circuit and around the country have compelled production of unredacted documents[5]. *See Tween Brands Inv., LLC v. Bluestar All., LLC*, 2015 U.S. Dist. LEXIS 152399, 2015 WL 6955177, at *1 (S.D. Ohio Nov. 10, 2015) (compelling production of unredacted documents where defendant had initially redacted portions of documents it characterized as "highly confidential"); *Kirsch v. Brightstar Corp.,* 68 F. Supp. 3d 846, 857 (N.D. Ill. 2014) (finding that the protective

---

[4] To the extent that RNDC claims that Sazerac also redacted documents, this argument is without merit.  Sazerac redacted very limited portions of distributor agreements with third parties.  Here, Sazerac is not seeking RNDC's agreements with suppliers.  Rather, in fact, RNDC already is aware of Sazerac's distributors as evidenced by the subpoenas that RNDC served on those third parties.

[5] To the extent that RNDC argues that Sazerac allowed for redactions pursuant to the parties' ESI Protocol, that argument similarly lacks merit once Sazerac raised concerns about RNDC's redactions.  Additionally, as further elaborated on below and contrary to RNDC's assertions, the documents at-issue are relevant as they reflect the swapping of Sazerac products for other supplier products, which are directly related to Sazerac's unclean hands and failure to mitigate defenses.

order adequately resolved issues concerning sensitivity and that relevant confidential information was not sufficiently sensitive to warrant redaction on that basis); *Raymond James & Assocs., Inc. v. 50 N. Front St., Tenn., LLC*, 2018 U.S. Dist. LEXIS 224695 (W.D. Tenn. Oct. 3, 2018) (finding protective order sufficient "to alleviate any concerns related to disclosure of confidential information"); *Beasley v. First Am. Real Estate Info. Servs., Inc.*, 2005 U.S. Dist. LEXIS 34030, *4-5 (N.D. Tex. Apr. 27, 2005) (compelling production of unredacted documents). Accordingly, for this reason alone the Court should order RNDC to produce unredacted versions of these documents, and any related documents.

*Third,* not only has RNDC redacted the necessary timing information from its documents, but RNDC has also failed to respond fully to Interrogatory No. 20 to provide information as to the timing of its actions swapping out Sazerac's products for other suppliers' products. Regardless of whether the redacted documents contain such information, RNDC must fully respond to the discovery requests with information related to the timing of the swaps.

*Finally*, regardless of the above, RNDC must identify and disclose, under its Rule 26(a)(1) obligations, the identities of those suppliers that have information relevant to RNDC's claims (that it did not swap out Sazerac products until following February 1, 2023) and Sazerac's defenses (that RNDC worked with other suppliers to swap out Sazerac products during the termination period between December 30, 2022 and February 1, 2023).

## CONCLUSION

Wherefore, fore the foregoing reasons, Sazerac respectfully requests that the Court grants it Motion to Compel and order RNDC to (1) produce unredacted versions of the 326 documents identified in Exhibit A; (2) fully respond to Sazerac's discovery requests, including production of any additional documents responsive to RFP Nos. 47 and 55 and a complete response to Interrog.

15

No. 20, including the timing of RNDC's actions; and (3) identify the identities of those suppliers that have information relevant to RNDC's claims and Sazerac's defenses, including information concerning the swapping out of Sazerac products and the related timing.

Dated this 2nd day of July, 2024.

Respectfully submitted,

/s/ Sarah M. McKenna
Sarah M. McKenna
Dinsmore & Shohl LLP
101 S. Fifth St., Suite 2500
Louisville, Kentucky 40202
Telephone: 502.540.2300
Facsimile: 502.585.2207
Email: sarah.mckenna@dinsmore.com

Gregory S. Tamkin (admitted *pro hac vice*)
Andrea Ahn Wechter (admitted *pro hac vice*)
Maral J. Shoaei (admitted *pro hac vice*)
Dorsey & Whitney LLP
1400 Wewatta Street, Suite 400
Denver, Colorado 80202
Telephone: 303.629.3400
Email: tamkin.greg@dorsey.com
Email: wechter.andrea@dorsey.com
Email: shoaei.maral@dorsey.com

*Attorneys for Sazerac Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was this 2nd day of July, 2024 electronically filed through the CM/ECF system and a copy served via the Court's CM/ECF system upon all counsel of record.

/s/ Sarah M. McKenna
*Counsel for Plaintiff*

16