UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLEDIVISION
Case No. 3:23-cv-00025-GNS-LLK

SAZERAC COMPANY, INC.,                                    PLAINTIFF

v.

REPUBLIC NATIONAL                                        DEFENDANT
DISTRIBUTING COMPANY, LLC,

## MEMORANDUM OPINION AND ORDER

This matter has been referred to Magistrate Judge Lanny King to hear and determine all pretrial matters. Text Order of May 14, 2024, [DN 85]. Before the Court is Defendant Republic National Distributing Company, LLC's Second Motion to Compel. [DN 99] ("Motion"). The Court held a status conference to address pending discovery disputes on June 17, 2024, but was unsuccessful in resolving the issues. Order of June 18, 2024, [DN 94]. Accordingly, the parties were granted leave to file the instant Motion, *id.*, and Sazerac's parallel Motion to Compel, [DN 97]. Sazerac filed their Response to the instant Motion, [DN 110], and RNDC has filed its Reply, [DN 119]. The Motion being fully briefed and ripe for review, the Court shall **GRANT IN PART AND DENY IN PART** RNDC's Second Motion to Compel. Motion [DN 99].

1. **Legal Standard**

District courts have broad discretion over docket control and the discovery process. *See In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir. 1996). "It is well established that the scope of discovery is within the sound discretion of the trial court." *Lavado v. Keohane*, 992 F.2d 601, 604 (6th Cir. 1993) (citation omitted). Motions to compel discovery responses are authorized where a party fails to provide proper responses to requests for production of documents under

Rule 34. Fed. R. Civ. P. 37(a)(3)(B)(iv). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond." Fed. R. Civ. P. 37(a)(4). The moving party "bears the initial burden of demonstrating relevance of the information or materials requested." *Veritiv Operating Company v. Phoenix Paper Wickliffe, LLC*, NO. 5:21-CV-00170-BJB-HBB, 2023 WL 2975868, at *6 (W.D. Ky. April 17, 2023). Once met, the burden shifts to "the party objecting to the motion to compel to show in what respects the discovery requests are improper." *Polylok, Inc. v. Bear Onsite, LLC*, No. 3:12-CV-00535-DJH-CHL, 2017 WL 1102698, at *3 (W.D. Ky. March 23, 2017) (citing *Kafele v. Javitch, Block, Eisen & Rathborne*, No. 2:03cv00638, 2005 WL 5095186, at *1 (S.D. Ohio April 20, 2005)).

Rule 26(b) of the Federal Rules of Civil Procedure allows a party to obtain any "nonprivileged matter that is relevant to any party's claim or defense...." Fed. R. Civ. P. 26(b)(1). The discovery "need not be admissible evidence to be discoverable." *Id.* This language is broadly construed to "encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense." *Veritiv Operating Company*, 2023 WL 2975868, at *6 (internal citations omitted). However, the scope of discovery has limits. "On motion or on its own, the court must limit the frequency or extent of discovery ... if it determines that ... the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii).

In a diversity case, the court applies federal law to resolve work product claims and state law to resolve attorney-client claims. *Baker v. General Motors Corp.*, 209 F.3d 1051, 1053 (8th

Cir. 2000); *see also* Fed. R. Evid. 501; *Jewell v. Holzer Hosp. Found., Inc.*, 899 F.2d 1507, 1513 (6th Cir. 1990).

Kentucky's "lawyer-client privilege" is set forth in the Kentucky Rules of Evidence. *Haney v. Yates*, 40 S.W.3d 352, 354 (Ky. 2000); *accord* KRE 503. It protects confidential communications made "for the purpose of facilitating the rendition of professional legal services[.]" KRE 503(b). "Whether a particular communication is privileged depends (absent waiver) ... on the facts and circumstances under which the communication was made." *Lexington Pub. Library v. Clark*, 90 S.W.3d 53, 59 (Ky. 2002). The privilege "should be strictly construed[.]" *Haney*, 40 S.W.3d at 355. The privilege only protects confidential communications between the client, a representative of the client, the lawyer, or a representative of the lawyer. KRE 503(b). A "[r]epresentative of the client" is defined, *inter alia*, as any "employee or representative of the client who makes or receives a confidential communication: (i) In the course and scope of his or her employment; (ii) Concerning the subject matter of his or her employment; and (iii) To effectuate legal representation for the client." KRE 503(a)(2)(B). "[T]he party claiming the privilege ... must provide the court with sufficient information to show the existence of the elements of the privilege and to allow review of that decision by higher courts." *Collins v. Braden*, 384 S.W.3d 154, 164–65 (Ky. 2012).

Federal Rule of Civil Procedure 26(b)(3) protects from discovery documents and tangible things prepared in anticipation of litigation by or for a party or by or for that party's representative. A party asserting the work product privilege bears the burden of establishing that the documents he or she seeks to protect were prepared "in anticipation of litigation." *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir.2006). The Sixth Circuit defines "in anticipation of litigation" by asking whether a document "was prepared or obtained *because of*

the prospect of litigation." *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006)

(internal quotations omitted) (emphasis in original). To be protected, a party must produce a

document while having had "a subjective belief that litigation was a real possibility, and that

belief must have been objectively reasonable." *Id.* at 594 (collecting cases). A document "will

not be protected if it would have been prepared in substantially the same manner irrespective of

the anticipated litigation." *Id.* at 593–4. A party may satisfy its burden or oppose a nonmovant's

contentions showing anticipation of litigation "in any of the traditional ways in which proof is

produced in pretrial proceedings" such as affidavits, depositions, or answers to interrogatories.

*Id.* at 597.


     2.  <u>Analysis</u>

     RNDC moves the Court to compel production of four (4) categories of documents and

updated answers to three of its interrogatories. Motion [DN 99] at 6–23. The Court will evaluate

each of the categories in turn.


     a.  <u>The Deloitte Emails</u>

     First, RNDC requests 105 emails between Deloitte and Sazerac that Sazerac identified in

its privilege log but were not produced in full. Motion [DN 99] at 6–7. Sazerac does not contend

that the Deloitte Emails are not relevant. Instead, Sazerac invokes either the attorney-client

privilege or work product doctrine to shield the Deloitte Emails from discovery. Sazerac

identified the basis of its claim for privilege as the attorney-client privilege for 88 emails, work

product for one email, and both attorney-client privilege and work product for twelve emails.

Motion [DN 99] at 8. The remaining four documents have no privilege identification because

they are calendar entries and part of privileged families, which Sazerac alleges the parties had agreed not to break. Response [DN 110] at 8.

RNDC argues that Sazerac inappropriately invokes privilege for three reasons. First, the Deloitte Emails were for a business purpose, not for seeking legal advice. Motion [DN 99] at 8–11. Second, Deloitte is not a "representative of the client" as required by KRE 503. *Id.* at 11–13. Finally, the Deloitte Emails were not prepared in anticipation of litigation. *Id.* at 13–14.

Sazerac contests each of these points. Sazerac states that Deloitte was retained "as a contractor" for "assistance for aiding in a potential transition away from RNDC[.]" Response [DN 110] at 9. This included "assisting in the effectuation of legal advice by Sazerac's counsel[.]" *Id*. As evidence, Sazerac points to the titles of the Deloitte Emails which make clear that "communications were made or were being elicited to effectuate legal advice[.]" *Id.* at 10. Sazerac also notes that "nearly all" of the Deloitte Emails included its in-house counsel. *Id.* at 8.

Sazerac's proffer is insufficient to invoke the protection of attorney-client privilege. Sazerac has the burden to show that each of the Deloitte Emails is protected by the attorney-client privilege, and that privilege must be interpreted narrowly. *Haney*, 40 S.W.3d at 355. Under Kentucky law, a party cannot invoke the privilege merely because counsel is a sender or recipient of a document—the documents "must be made for the purpose of obtaining or furthering the rendition of legal services to the client." *Collins v. Braden*, 384 S.W.3d 154, 161 (Ky. 2012). This distinction is especially important when evaluating privileged communications for in-house counsel, who are involved in "both business and legal considerations." *Burton v. Zwicker & Associates, PSC*, No. 10-227-WOB-JGW, 2012 WL 12925675, at *2 (E.D. Ky. Jan. 9, 2012). Likewise, a document's subject line cannot alone establish the attorney-client privilege. *Clark v. Louisville Jefferson County Metro Government*, No. 3:17-cv-419-GNS-CHL, 2022 WL

4389549, at *10 (W.D. Ky. Sept. 22, 2022). On the evidence before it, the Court cannot hold that the attorney-client privilege applies to the Deloitte Emails.

Even with a more detailed privilege log, RNDC contends that the attorney-client privilege cannot apply in any context because Deloitte is not a "representative of" Sazerac as required by KRE 503. Response [DN 110] at 7–8 n.2. Kentucky courts have not directly addressed whether a third-party consultant qualifies as a "representative" under KRE 503, but have provided some guidance as to the principles underpinning KRE 503. *See, e.g.*, *Lexington Pub. Lib.*, 90 S.W.3d 53, 59 ("The definition of 'representative of the client' in KRE 503(a)(2) was intended to embody the principles enunciated in *Upjohn v. United States*[.]"). Several Circuits have adopted a "functional equivalen[ce]" test first expressed by the Eighth Circuit in *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), to determine if a third-party is covered under the attorney-client privilege. *See id.* at 936; *United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010); *Berisha v. Lawson*, 973 F.3d 1304, 1319 (11th Cir. 2020). While the Sixth Circuit has not explicitly adopted the test, district courts in this Circuit (including this Court) have recognized the test's persuasiveness. *See Burkhead & Scott, Inc. v. City of Hopkinsville*, No. 5:12-cv-198-GNS, 2014 WL 7335173, at *1 (W.D. Ky. Dec. 19, 2014).[1]

Courts have distilled the functional equivalence test down to three basic elements with respect to outside consultants: (1) "whether the consultant had primary responsibility for a key corporate job," (2) "whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in

---

[1] Upon this Court's review, it appears that no circuit court has categorically declined adoption of the functional equivalence test, but some district courts have expressed reservations about doing so in certain circumstances. *See BSP Software, LLC v. Motio, Inc.*, No. 12 C 2100, 2013 WL 3456870, at *2–3 (N.D. Ill. July 9, 2013) ("Adopting the functional equivalent test would blur the line between privilege and waiver, complicating the decision about whether to disclose privileged information to a third party.").

litigation," and (3) "whether the consultant is likely to possess information possessed by no one else at the company." *See Export–Import Bank v. Asia Pulp & Paper Co., Ltd.,* 232 F.R.D. 103, 113 (S.D.N.Y.2005); *LG Electronics U.S.A., Inc. v. Whirlpool Corp.,* 661 F.Supp.2d 958, 962 (N.D.Ill.2009) (adopting the functional equivalent test).[2] It is not an easy test to pass. *Sec. & Exch. Comm'n v. Rayat*, 2023 WL 4420325, at *5 (S.D.N.Y. July 10, 2023) (collecting cases) ("Most decisions ... reject the assertion of privilege based on the functional employee exception.")

Sazerac puts forth arguments for at least one of these three factors. Sazerac states that Deloitte's "representatives worked closely and continuously with Sazerac employees" on "matters critical to a potential transition," and supports that statement with a sworn declaration from their Chief Legal Officer. Response [DN 110] at 12; Loebl Declaration [DN 110-2] ¶¶ 7–10. However, the relevant statements—sworn or unsworn—are conclusory and do little more than recite the second element of the functional equivalence test. Sazerac has not provided factual clarity sufficient for this Court to find a close, continuous relationship; relevant to this analysis are details such as how many months (or years) individual consultants worked directly with Sazerac employees,[3] how many hours each day, and whether they shared physical proximity. *See, e.g., Rayat*, 2023 WL 4420325, at *3 (collecting cases) (contractor "intimately

---

[2] This "narrow interpretation" of the functional equivalence test, with these or similarly defined elements, has not been universally followed. Other courts have taken a "broad," "practical," or "balanced" approach, considering various characteristics surrounding the consultant's communications and relationship with the company, and allowing a wider application of privilege. *See Fosbre v. Las Vegas Sands Corp.*, Case No. 2:10-cv-00765-APG-GWF, 2016 WL 183476, at *3–4 (comparing the various considerations courts have taken, such as asking the "dispositive question" of whether "the consultant's relationship to the company and whether by virtue of that relationship he possesses information about the company that would assist the company's attorney's in rendering legal advice") (internal citation omitted). However, because testimonial privileges are construed narrowly under Kentucky law, *Haney*, 40 S.W.3d at 355, if the functional equivalence test is to be applied, it should favor a narrow approach.

[3] For example, if "Deloitte had been hired for less than two months," Reply [DN 119] at 4, this detail would not support the temporal aspect of this element.

involved ... over the period of many years") (internal citations omitted); *Export–Import Bank,*
232 F.R.D. at 113 ("during the most intense months ... he spent eighty to eighty-five percent of
his time on the restructuring deal, yet there were times he was free enough of his [company]
obligations to start and build a successful consulting business;" company provided the consultant
with an office "on the same floor as [company] executives" but did not assert that he ever used
that office).

  Furthermore, in neither Loebl's declaration nor Sazerac's filings does Sazerac provide
sufficient information relevant to the first element of the functional equivalence test (i.e., what
"key corporate job" Deloitte held and what level of responsibility Deloitte exercised in that role).
Instead, Sazerac explains that Deloitte "had the necessary expertise and guidance in assessing
various aspects of a potential transition in order to assist Sazerac and Sazerac's counsel."
Response [DN 110] at 12.  But this, without more, is not enough to show that Deloitte had
"*primary* responsibility for a key corporate job." *Rayat*, 2023 WL 4420325, at *5 (emphasis
added). Courts have found that consultants hired to assist management in discrete projects,
without having independent authority to make decisions on behalf of the company, and where
the consultants maintained other clients, were not conducting a "key corporate job" with
"primary responsibility." *See id.* Sazerac may have shown that Deloitte provided necessary
assistance and/or occupied an important role. It has not, however, shown the Deloitte
consultants' independent decision-making, or primary authority, in filling that role such that they
would be functionally equivalent to a Sazerac employee.

  As to the third element, Sazerac does not attempt to explain what information Deloitte
possesses which is unavailable to anyone else at Sazerac. This Court finds no need to draw any
inference based on what particular information Deloitte, as a consulting firm, may or may not

possess. *See Universal Std. Inc. v. Target Corp.*, 331 F.R.D. 80, 90 (S.D.N.Y. May 6, 2019)

(discussing functional equivalence test) ("It is of no great significance that [public relations firm

has] particular and unique expertise in the area of public relations, whereas [company] does

not.") Again, Plaintiff has not provided this Court "with sufficient information to show the

existence of the elements of the privilege and to allow review of that decision by higher courts."

*Collins*, 384 S.W.3d at 164–65 (Ky. 2012). Because Sazerac does not meet the requirements of

the functional equivalence test, the Court finds that it fails to meet its burden of showing the

Deloitte Emails are protected by the attorney-client privilege.

　　　　To the extent Sazerac claims the Deloitte Emails are protected by the work product

doctrine, RNDC argues that the doctrine does not apply because the Deloitte Emails were

generated for a business purpose and not in anticipation of litigation. Motion [DN 99] at 13–14.

As explained above, the privilege log does not provide the explanation necessary to evaluate

whether the work product doctrine applies to the Deloitte Emails. Sazerac has failed to meet their

burden of showing the doctrine applies; accordingly, the Court finds that the Deloitte Emails are

discoverable.

　　　　　　　　b.　Actual and Potential Successor Distributor Documents [Request for
　　　　　　　　　　Production Numbers 15 and 16]

　　　　Next, RNDC moves to compel documents responsive to its Request for Production

numbers 15 and 16. Motion [DN 99] at 15.  Request for Production 15 seeks "[a]ll documents

and communications internal to Sazerac, shared with RNDC, or shared with nonparties, relating

to or reflecting Sazerac's reasons for terminating/replacing, decision to terminate/replace, efforts

towards terminating/replacing, and ultimate replacement of RNDC in one or more Terminated

States with other distributions, including communications between Sazerac, or any representatives of Sazerac, on the one hand, and any wine or spirits distributor other than RNDC, on the other hand, discussing, considering or assessing the possibility of Sazerac ending its relationship with RNDC in one or more of the Terminated States and/or replacing RNDC in one or more of the Terminated States with a different distributor." [DN 99-18] at 16. Sazerac produced documents "relating to terminating/replacing, and ultimate replacement of [RNDC]." *Id.* at 17. Request for Production 16 seeks "[a]ll documents and communications internal to Sazerac, shared with RNDC, or shared with nonparties relating to the December 2022 Termination, including both documents leading up to and following the delivery of December 30, 2022 Termination Notice and relating to the December 2022 Termination. This Request specifically includes internal Sazerac documents and communications, documents shared with RNDC or nonparties, and communications between Sazerac and any other party (including retail customers, media outlets, social media personalities, YouTube personalities, newsletters, websites, and/or blogs)." *Id*. Sazerac conditionally agreed to produce documents subject to entry of an "acceptable ESI Agreement and Confidentiality Agreement." *Id.* at 18.

RNDC states that Sazerac has failed to produce relevant documents related to its actual successor distributors and has excluded documents related to potential successor distributors. Motion [DN 99] at 14–19. Because Sazerac objects to these requests on the basis of relevance and overbreadth, Response [DN 110] at 14, RNDC must show that the documents requested are relevant, *Veritiv Operating Company*, 2023 WL 2975868, at *6. But relevance is construed broadly, encompassing "any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense." *Id*. Contrary to Sazerac's claim that "this case is about RNDC, not any successor distributor," Response [DN 110] at 15, RNDC's counterclaims

include claims for Fraudulent Inducement and Fraudulent Concealment. Answer and Counterclaims [DN 24] ¶¶ 143–53. As alleged, whether Sazerac acted in bad faith in its communications with other distributors would be relevant to proving RNDC's counterclaims. Motion [DN 99] at 15. This is true for any distributor contacted, regardless of whether they later entered into a distribution agreement with Sazerac.

A closer question is whether RNDC's requests are unduly burdensome. As Sazerac explains, it routinely engages in communications with potential distributors which could fall within RNDC's requests for production. Response [DN 110] at 15. If the Court enforced RNDC's requests for production as written, unlimited in scope or definite time, Sazerac would be forced to comb through years of communications, during time periods within which neither party has alleged any relevance, to numerous entities. There is a narrower class of documents which can be defined and still meet RNDC's legitimate discovery needs.

Accordingly, RNDC's Motion to compel documents responsive to its Request for Production numbers 15 and 16 is granted as to documents or communications made after the September 23, 2021 Global Distribution Agreement was signed. Sazerac will be compelled to produce documents or communications—as to both potential and actual successor distributors— relating to or reflecting Sazerac's reasons for terminating/replacing, decision to terminate/replace, efforts towards terminating/replacing, ultimate replacement of RNDC, and relating to the December 2022 Termination.

c.  Interrogatories 4, 6, and 7

RNDC seeks "definitive answers" from Sazerac regarding Interrogatories number 4, 6, and 7. Motion [DN 99] at 20. These interrogatories ask Sazerac to "[i]dentify the first date on

which Sazerac or any Sazerac Representative contacted or spoke with each actual and potential

Successor Distributor about a potential supplier-relationship in any Terminated State[;]"

"[i]dentify each entity Sazerac contacted and/or spoke with about a potential supplier-distributor

relationship ... but did not ultimately enter into any supplier-distributor relationship with that

entity[;]" and "identify the terms Sazerac proposed for any such potential supplier-distributor

relationship[.]" [DN 99-19] at 4–5. Sazerac objects to these interrogatories as overbroad and

irrelevant. *Id.* Sazerac does provide some answers to Interrogatories 4 and 6, stating that it

"routinely [has] communications" with other distributors, and that those discussions became

"more concerted" following RNDC's notice of termination in June 2022. *Id.* Sazerac does not

respond to Interrogatory number 7. *Id.*

  As explained above, Sazerac's communications with potential distributors are relevant,

and RNDC has a right to some information about those conversations for the purpose of its

counterclaims. Unlike RNDC's requests for production, RNDC's interrogatories are limited in

scope by time. *Id.* (limiting responses to entities contacted from January 1, 2022 through

December 30, 2022). Accordingly, Sazerac must provide a more thorough answer to RNDC's

Interrogatory 6 by providing the name, contact information, and dates of contact with each entity

approached about a potential supplier-distributor relationship in the Terminated States between

January 1, 2022, and December 30, 2022. To the extent not already provided in response to

Interrogatories 3 and 6, Sazarac must answer RNDC's Interrogatory 4 by providing the first date

of contact with actual or potential successors.

  RNDC's Interrogatory 7 is more invasive. There, RNDC requests terms of actual and

potential contracts with non-parties. Neither party engages in substantive argument as to the

discoverability or non-discoverability of these documents, and the Court is not willing to order their disclosure on the current record.

### d.   Transition Documents [Request for Production 26]

RNDC's Request for Production 26 seeks documents "related to how Sazerac customarily handles the transition of inventory following termination of a distributor." Motion [DN 99] at 20. Sazerac argues that evidence of its practices cannot establish industry custom and is therefore irrelevant. Response [DN 110] at 19. This mistakes weight of evidence for relevancy. Other courts have found that even if not dispositive, the practices of a party can be evidence of industry custom. *See Deutsche Bank Securities, Inc. v. Kingate Global Fund Ltd.*, 19 Civ. 10823 (ER), 2021 WL 6052855, at *3 (S.D.N.Y. Nov. 12, 2021). However, as currently worded, RFP 26 is overbroad. It specifically seeks "all documents and communications relating to or reflecting *any scenario, ever*, in which Sazerac has changed distributors in a state." [DN 99-18] at 25 (emphasis added). The Court will not grant such a wide-ranging request.

### e.   Profit and Loss Documents [Request for Production 64]

Finally, RNDC seeks "[a]ll documents and communication comparing the profits and losses from sales of Sazerac products in states or territories where RNDC served as Sazerac's distributor to the sales of Sazerac products in states or territories where RNDC did not serve as Sazerac's distributor. This Request is for documents created or updated from January 1, 2020, to the present." [DN 99-18] at 55. Sazerac argues that its financials are "neither relevant nor proportionate to the case." Response [DN 110] at 20. Sazerac again contends that "questions in this case relate solely to RNDC's performance as a distributor, not others." *Id.* While Sazerac

cites to another court in this Circuit for the proposition that profit and loss statements for the relevant party are sufficient discovery, Response [DN 110] at 20, that motion to compel concerned damages calculations and not liability. *Orthofix Inc. v. Lemanski*, No. 13-11421, 2015 WL 1488267, at *1 (E.D. Mich. March 31, 2015) (finding that dismissal of certain counts did not diminish the relevance of requested discovery into remaining counts involving damages and lost profits). In contrast, RNDC's counterclaims rely on proving that Sazerac's termination of RNDC was pretextual, and relevant discovery would necessarily be broader here. Reply [DN 119] at 10. Accordingly, the Court shall order Sazerac to produce documents and communications, from January 1, 2020 to the present, comparing the profits and losses from sales of Sazerac products in RNDC-served states to other distributor states.

## CONCLUSION AND ORDER

In light of the foregoing, the Court GRANTS IN PART AND DENIES IN PART Republic National Distributing Company, LLC's Second Motion to Compel, [DN 99], and HEREBY ORDERS that:

1. RNDC's Second Motion to Compel is granted as to Request for Production numbers 15, 16, 26, and 64, in accordance with this Opinion and Order, and Sazerac shall supplement its responses no later than thirty (30) days from its entry.

2. RNDC's Second Motion to Compel is granted as to Interrogatory numbers 4 and 6, in accordance with this Opinion and Order, and Sazerac shall supplement its responses no later than thirty (30) days from its entry.

3. RNDC's Second Motion to Compel is denied, without prejudice, as to Interrogatory number 7.

October 3, 2024

Lanny King, Magistrate Judge
United States District Court